JDN

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ron Zachary Pettit,       ) | No. CV 11-2139-PHX-DGC (JFM) |
| Plaintiff,       ) | **ORDER** |
| vs.       ) | |
| Charles L. Ryan, et al.,       ) | |
| Defendants       ) | |

Plaintiff Ron Zachary Pettit brought this civil rights action under 42 U.S.C. § 1983 against multiple Arizona Department of Corrections (ADC) employees (Doc. 1). Before the Court is Defendants' Motion for Summary Judgment (Doc. 125), which Plaintiff opposes (Doc. 142).[1]  The Court will deny the motion.

**I.    Background**

Plaintiff's claims arose during his confinement at the Arizona State Prison Complex (ASPC)-Eyman, Special Management Unit I in Florence, Arizona (Doc. 1 at 1).  He named as Defendants Corrections Officer (CO) Torrey Smith; CO IIs Scott Mueller and Jose Luque; and Sergeant Amy Morrow (id. at 1B-2).[2]  Plaintiff alleged that in April 2011, during an

---

[1] The Court issued the Notice required under Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998), informing Plaintiff of his obligation to respond to Defendants' motion and the requirements under Federal Rule of Civil Procedure 56 (Doc. 128).

[2] On screening, the Court dismissed eight other Defendants named in the Complaint (Doc. 12).

escort from the shower back to his cell, Smith used excessive force against him in violation of the Eighth Amendment (id. at 3-3B). Plaintiff further alleged that Morrow, Mueller, and Luque watched this use of force but failed to intervene (id.).

Defendants now move for summary judgment on the grounds that they did not use excessive force and they are entitled to qualified immunity (Doc. 125).

## II.     Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250 (1986); see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968), but must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted); see Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence, and draw

all inferences in the nonmovant's favor. Id. at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Factual Assertions

### A. Defendants

In support of their motion, Defendants submit a separate Statement of Facts (DSOF), to which they attach copies of Defendants' responses to discovery requests, copies of an Incident Report and officers' Information Reports, and the declaration of Sergeant Ralph Navarrette (Doc. 126, Exs. B-I & Attachs.).

Defendants assert the following relevant facts:

As of March 26, 2011, ADC issued a High Risk Inmate Notification regarding Plaintiff, which indicated that he had a history of aggression and physical assaults towards staff during escorts (DSOF ¶ 8). Movement of a high-risk inmate required two officers, handcuffs with a lead chain and leg irons, the presence of a video camera and recording of all movements, and a supervisor to oversee the movement (id. ¶ 9). When hand restraints/handcuffs are applied or removed, the inmate must place his hands through the cell-door food-trap door (trap) and keep both hands on the trap until the officer has completed the task (id. ¶ 10). Anytime a high-risk inmate's trap is opened, two officers must be present (id. ¶ 11).

On the date of the incident underlying this lawsuit, April 16, 2011, Plaintiff was designated a high-risk inmate due to his history of assaultive behavior toward staff (id. ¶ 7). Lieutenant Littleton was the shift supervisor that day (id. ¶ 3). Sergeant Morrow was the supervising sergeant assigned to supervise the escort of Plaintiff, and she applied and removed Plaintiff's leg cuffs (id. ¶¶ 4, 14). CO II Mueller was the videographer at the time of the incident (id. ¶ 12). CO II Luque was responsible for applying and removing Plaintiff's handcuffs and lead restraint (id. ¶ 13). CO II Smith was responsible for Plaintiff's lead chain (id. ¶ 15).

Plaintiff was restrained and escorted from his cell to the showers without incident (id. ¶ 16). When Plaintiff arrived at the shower, he was upset when he had to kneel without any

1  padding for his knees, which he had to do to have his leg cuffs removed (id. ¶ 17).  Plaintiff
2  was agitated, yelling, uncooperative, and he made threats towards staff (id.).  After his
3  shower, Plaintiff refused to kneel down (id. ¶ 18).  He finally complied and allowed Luque
4  to apply leg cuffs and handcuffs with a lead chain (id. ¶ 19).  Although Plaintiff was directed
5  to back out of the shower, he turned to exit facing forward, which put at risk all officers'
6  safety (id. ¶ 20).  As Plaintiff walked from the shower to his cell, he constantly pulled at the
7  lead chain held by Smith, and he continued to verbally curse and threaten Defendants, with
8  particular attention to Smith (id. ¶¶ 21-22).

9  When they arrived at Plaintiff's cell, Plaintiff continued to be uncooperative and
10 refused to kneel in his cell for removal of his leg cuffs (id. ¶ 23).  Plaintiff finally consented
11 to kneel to allow removal of the leg cuffs, but then he refused to stand up (id. ¶ 24).  After
12 Plaintiff complied and stood up, Defendants shut his cell door; however, Plaintiff tried to pull
13 the lead chain held by Smith (id. ¶ 25).  Smith used force to maintain possession of the lead
14 chain and prevent Plaintiff from pulling the chain into his cell (id. ¶ 26).  Plaintiff then
15 backed up to the cell door for Luque to uncuff his hands, and he placed his hands through the
16 trap (id. ¶ 27).

17 When the officers were attempting to remove Plaintiff's hand restraints, Smith gave
18 Plaintiff several verbal directives to place his hands on the trap, but Plaintiff refused to
19 comply (id. ¶ 28).  Although his position was proper, Plaintiff's behavior continued to be
20 aggressive and problematic; he was wiggling, tugging, and pulling on the lead chain, which
21 made it difficult for Luque to remove the handcuffs (id. ¶ 29).  As soon as Luque released
22 Plaintiff's first hand from the handcuffs, Plaintiff attempted to grab Smith's stab vest (id.
23 ¶ 30).  To thwart him, Smith pressed down on Plaintiff's hand/wrist/arm to secure it against
24 the open trap (DSOF ¶ 31).  As soon as Luque released Plaintiff's second hand from the
25 handcuffs, Plaintiff again attempted to grab Smith's stab vest (id. ¶ 32).  To thwart him,
26 Smith again pressed down on Plaintiff's hand/wrist/arm to secure it against the open trap (id.
27 ¶ 33).

28 Smith did not pull or yank the lead chain through the trap any more than needed or

required, nor did Smith assault Plaintiff, beat Plaintiff's hands, or throw any punches (id. ¶ 38). In one quick motion, Smith let go of Plaintiff's hands, Plaintiff pulled his hands into his cell, and Smith quickly closed and secured the cell-door food trap (id. ¶ 34).

Mueller relinquished the video recorder and video of the incident to Morrow, and, although Morrow provided the video of the incident to Lieutenant Littleton, her supervisor, the videotape was not preserved (id. ¶¶ 36-37).

Later in the day on April 16, 2011, Smith's supervisor, Sergeant Navarette, interviewed Plaintiff about the incident (id. ¶ 39). Navarette was aware that Morrow had concerns about the incident and about Smith's behavior during the incident (id. ¶ 40). Morrow wrote an Information Report Supplement about the incident; this report stated that Smith behaved unprofessionally in his interactions with Plaintiff (id. ¶ 50).

At Plaintiff's request, Navarette arranged a meeting between Plaintiff and Smith (id. ¶ 41). Plaintiff apologized to Smith, and Plaintiff and Smith agreed that the situation between them was good (id. ¶¶ 45-46).

Navarette concluded that Smith did not use excessive force, and Lieutenant Littleton never wrote an Incident Report about the incident; there were only supplements written by each Defendant (id. ¶ 49). Smith did not give Plaintiff a disciplinary ticket for his uncooperative and aggressive behavior because the escort did not result in any injury to staff or Plaintiff (id. ¶ 56).

Later in the day on April 16, 2011, Plaintiff was seen by medical for complaints of wrist and hand pain. Nurse K. Nielsen noted a red mark on the top side of each wrist but no abrasions or open wounds (id. ¶ 57).

**B.    Plaintiff**

With his opposition memorandum (Doc. 142), Plaintiff submits his own separate Statement of Facts (PSOF), which is supported by copies of his high-risk inmate notification, various April 16, 2011 officer reports and supplemental reports, court documents, grievances, medical records, and the declaration of Lieutenant Littleton (Doc. 143; Doc. 142, Exs. B-K).

Plaintiff asserts the following relevant facts:

1   Plaintiff was considered a high-risk inmate, and his high-risk inmate notification
2   required that every movement outside of his cell be recorded. The incident on April 16, 2011
3   was recorded (PSOF ¶ 2).

4   On that date, when Plaintiff exited the shower, leg irons were placed on him and the
5   lead chain was applied to his wrists with the handcuffs (Doc. 142 at 2). When the shower
6   door was opened, Plaintiff turned to walk straight out of the shower, at which point Smith
7   grabbed him by the arm and pushed him roughly into the wall (id.). A verbal exchange
8   began between Smith and Plaintiff (id.). Smith, who was responsible for the lead chain,
9   roughly pulled Plaintiff from the shower with the chain and became more aggressive with
10  the chain as they moved closer to Plaintiff's cell (id.). Smith exchanged "bad words" with
11  Plaintiff all the way to the front of his cell (id.). Smith began pulling hard on the handcuff
12  part of the lead chain such that it caused Plaintiff harsh pain and elicited more verbal insults
13  from Plaintiff (id.).

14  Plaintiff entered his cell for Morrow to remove the leg irons (id.). Plaintiff disputes
15  Defendants' assertion that he refused to stand up after removal of the leg cuffs; Plaintiff
16  states that under the applicable procedures, inmates cannot stand until the door of the cell is
17  fully closed (PSOF ¶ 10). Plaintiff also disputes that he refused to place his hands on the trap
18  after he backed up to the cell door; he states that in that position – with his hands cuffed
19  behind him and his back against the cell door – there is no choice but to hold one's hands out
20  of the trap (id. ¶ 11).

21  Plaintiff slowly backed up to the door, at which point Smith pulled on the chain
22  unnecessarily, so Plaintiff tugged back a little on the chain (Doc. 142 at 2). Plaintiff had both
23  of his hands on the trap (PSOF ¶ 12). Smith then snatched Plaintiff's wrist through the trap
24  with great force, which forced Plaintiff to turn his body to the right to try to relieve pressure
25  on his wrist and shoulders (Doc. 142 at 2). Smith was yanking the chain up and down
26  constantly, and Plaintiff screamed in pain and asked Morrow to stop Smith's actions (id.).
27  Morrow and the other officers just watched (id.).

28  When Luque uncuffed Plaintiff's left wrist, Plaintiff immediately turned his body

1  square to the door and placed his hand on the trap (id.). Plaintiff did not ever reach for Smith
2  or try to grab Smith's stab vest (PSOF ¶¶ 13-16). Smith did not have to press down
3  Plaintiff's wrist or hand because Plaintiff was holding the food trap (id. ¶ 14). But Smith was
4  holding down Plaintiff's right hand so Luque could uncuff it (Doc. 142 at 3). After his right
5  hand was uncuffed, Plaintiff grabbed hold of the food trap with his right hand so that the trap
6  could not be closed (id.). Smith began to try to remove Plaintiff's grip using his hands; when
7  he could not remove Plaintiff's grip, he began to twist Plaintiff's wrist to force Plaintiff's
8  hand loose (id.). At this point, Morrow began to shake her "o.c." pepper spray can to spray
9  Plaintiff, but before she deployed the spray can, Smith "blew up" and began to repeatedly
10 beat and pound Plaintiff's right wrist, arm, and fingers very hard with his closed fist (id.;
11 PSOF ¶ 20). Morrow then physically blocked Smith's blows with her arm and told Smith
12 to stop (Doc. 142 at 3; PSOF ¶ 20). Plaintiff let go of the trap, and Morrow closed the trap
13 (Doc. 142 at 3).

14 Morrow, Luque, and Mueller began to exit the pod, but Smith stayed at Plaintiff's
15 door to curse Plaintiff out and threaten him and another person (id.).

16 Morrow returned to Plaintiff's cell later to check on Plaintiff and talk about the
17 incident (id.). Morrow asked Plaintiff to drop it because Smith had already been chewed out
18 for being unprofessional (id.). Plaintiff said he would not drop it and he wanted a nurse to
19 look at his wrist and hands (id.). Nurse Nielsen, who was passing out medications, examined
20 Plaintiff's wrists, concluded they were damaged and bruised, and gave Plaintiff two pills and
21 left (id.).

22 Later that day, Morrow, Navarette, Mueller, and the video recorder escorted Plaintiff
23 to make a phone call (id.). Navarette asked about the incident, Plaintiff explained that Smith
24 assaulted him because he held the food trap and was verbally disrespectful; Navarette asked
25 Plaintiff to let it go (id.). Plaintiff asked Navarette to get Smith, which he did (id.). Plaintiff
26 and Smith discussed the issue, Smith apologized to Plaintiff, and Plaintiff returned to his cell
27 (id.). When he returned to his cell, Plaintiff began the grievance process, and he filled out
28 a health needs request to be seen in medical (id.). Plaintiff disputes that during his

1 conversation with Smith, he acknowledged that he was verbally abusive and uncooperative
2 during the escort or that he had given Smith a hard time, and he denies that he apologized to
3 Smith (PSOF ¶¶ 21-23).

4 On April 20, 2011, Plaintiff went to medical, at which time Sergeant Reyes of the
5 Special Security Unit spoke to Plaintiff and photographed Plaintiff's hand; this entire
6 conversation was recorded (Doc. 142 at 4). The photo and investigation report has since
7 been lost (id.).

8 Plaintiff disputes that he was not injured (PSOF ¶ 28). He suffered significant pain,
9 had numerous subsequent doctor visits, had to see a hand specialist at the hospital for a
10 ruptured tendon, and surgery is pending (id. ¶¶ 28-29).

**VI. Excessive Force Claim Against Smith**

    **A. Eighth Amendment Legal Standard**

13 Use of excessive force against an inmate violates the inmate's Eighth Amendment
14 right to be free from cruel unusual punishment. Graham v. Connor, 490 U.S. 386, 393-94
15 (1989). The use of force is constitutional if it is used in a good faith effort to keep or restore
16 discipline; it is unconstitutional if it is used "maliciously and sadistically for the very purpose
17 of causing harm." Whitley v. Albers, 475 U.S. 312, 320-21 (1986). Not "every malevolent
18 touch by a prison guard gives rise to a federal cause of action"; thus, de minimis uses of
19 physical force, provided that use of force is not "repugnant to the conscience of mankind,"
20 do not offend the Constitution. Hudson v. McMillan, 503 U.S. 1, 9-10 (1992).

21 A court considers five factors in determining whether a defendant's use of force was
22 malicious and sadistic for the purpose of causing harm: (1) the extent of the injury, (2) the
23 need to use the force, (3) the relationship between the need and the amount of force used,
24 (4) the threat "reasonably perceived" by the officials, and (5) "any efforts made to temper the
25 severity" of the force. Id. at 7 (citing Whitley, 475 U.S. at 321). When reviewing these
26 Whitley factors, the court must remember that prison officials "should be accorded
27 wide-ranging deference in the adoption and execution of policies and practices that in their
28 judgment are needed to preserve internal order and discipline and to maintain institutional

- 8 -

security." Whitley, 475 U.S. at 321-22 (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)).

### B.   Analysis

The parties present their opposing arguments on each of the five Whitley factors (Docs. 125, 142).[3] The Court will address each factor in turn. In this analysis, where the facts are disputed, Plaintiff's facts are taken as true. See Anderson, 477 U.S. at 255.

### 1.   Extent of Injury

The extent of a prisoner's injury may suggest whether force used could plausibly have been thought necessary in a particular situation. Hudson, 503 U.S. at 7. Although the extent of a prisoner's injury is relevant in the use of force determination, it is not decisive because a prisoner can state a claim even if he did not suffer a significant injury. See id. at 4; Wilkins v. Gaddy, 559 U.S. 34, 37-38 (2010); Schwenk v. Hartford, 204 F.3d 1187, 1196 (9th Cir. 2000) (the attack need not result in permanent injury). "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." Hudson, 503 U.S. at 9.

Defendants assert that the medical record for the day of the incident reflects only a complaint of wrist and hand pain and that at a follow up appointment on April 20, 2011, the record showed possible bruising (Doc. 125 at 7). According to Defendants, Plaintiff was given Ibuprofen, was apparently satisfied with the treatment received, and he did not follow up after the April 20, 2011 appointment (id.).

Plaintiff asserts that he sustained serious injuries to his neck, shoulders, arm sockets, upper right arm, wrists, and lower back, and a ruptured tendon in his right finger (Doc. 142 at 6). He states that ADC physicians have prescribed him the pain medication Naproxen to help him deal with the pain (id.). Plaintiff submits evidence showing that from the date of the incident to more than a year after the incident, he continually requested treatment and was regularly seen by medical personnel for pain in his hand, wrist, shoulder, and neck (Doc. 142, Ex. D (Doc. 142-4 at 18-19, 24-26, 28-35)). The medical records reflect that in September

---

[3]Plaintiff filed a sur-reply, which the Court will not consider (Doc. 146).

- 9 -

2011, Plaintiff was referred to a hand surgeon (id. (Doc. 142-4 at 21, 27)). He also saw a hand surgeon on April 3, 2012 (id. (Doc. 142-4 at 20, 25)). And Plaintiff avers that he may receive surgery on his hand (Doc. 143, PSOF ¶ 28; see Doc. 142, Ex. K (Doc. 142 at 22)).

On this record, Plaintiff's injuries were not life-threatening, but they were more than insignificant. This first factor weighs in his favor.

### 2. Need for Force

The Ninth Circuit has held that "the force which was applied must be balanced against the need for that force: it is the need for force which is at the heart of the [excessive force determination]." Alexander v. City and Cnty. of S.F., 29 F.3d 1355, 1367 (9th Cir. 1994).

Defendants contend that Plaintiff's disobedience suggested that force was required. Specifically, Defendants cite his threatening behavior, his pulling and yanking on the lead chain, and his attempts to grab Smith's stab vest as handcuffs were released (Doc. 125 at 7). Defendants submit that Plaintiff refused to follow directives, which constituted a challenge to their authority and escalated tensions between the parties (id. at 7-8). Defendants claim that once he was inside his cell, Plaintiff continued to disobey orders directing him to back up to the trap and allow officers to remove his handcuffs, and that Plaintiff then pulled the lead chain into his cell thereby heightening the safety risk to the officers (id. at 8). Defendants maintain that Smith used measured force to retrieve the lead chain by pulling it back through the trap (id.). They conclude that given these facts, Defendants reasonably perceived some threat from Plaintiff and accurately assessed the force required to combat that threat (id.).

Plaintiff concedes that he was verbally disrespectful to Smith, but avers that he never tried to grab Smith's stab vest. Rather, he held on to the food trap and made no threatening moves towards staff (Doc. 143; PSOF ¶ 13; Doc. 142 at 7).[4] He further states that in

---

[4]Plaintiff points to various documents in the record to argue that Defendants have provided conflicting stories regarding what actually happened in his cell (Doc. 142 at 6-7; see Doc. 143, PSOF ¶¶ 16-20, 24-26). At the summary judgment stage, the Court may not make credibility determinations or weigh the evidence. Anderson, 477 U.S. at 255. Therefore, as mentioned, where the facts are disputed, the Court applies Plaintiff's facts

response to Smith pulling and yanking on the chain, Plaintiff gave one small tug on the chain, and Smith responded by pulling Plaintiff's arms through he trap with great force (id.). Plaintiff claims that Smith then began to beat Plaintiff's right hand, wrist, and arm with a closed fist until Morrow stopped him (Doc. 142 at 3). Plaintiff notes that he received no disciplinary report for his alleged behavior, yet Smith was written up for his behavior (id. at 7). Plaintiff relies on Morrow's Information Report, dated April 16, 2011, in which she wrote that after Luque removed Plaintiff's right handcuff, "CO II Smith hit [Plaintiff's] arm with his closed hand. I was ready to activate the o.c. spray out. [I] told Smith to stop . . . I went straight to Lt. Littleton about the situation. He advised me to do a PACE entry for being unprofessional" (Doc. 143, PSOF ¶ 19; Doc. 126, Ex. I, Attach. 1 (Doc. 126- 2 at 42)).[5] Plaintiff states that Morrow subsequently wrote a PACE entry for Smith's conduct; however, this PACE entry, along with the videotape, which would support his claim, have both disappeared (Doc. 142 at 6-7).[6]

The crux of Plaintiff's excessive-force claim is Smith's alleged yanking of the lead chain to pull Plaintiff's arms through the trap and his beating of Plaintiff's right hand, wrist, and arm. Plaintiff concedes that he was holding the food trap at that point, which prevented Defendants from closing the trap. Plaintiff further concedes that Morrow would have been justified in using pepper spray to get him to release his grip on the trap and that she was about to deploy her pepper spray can (id. at 3). The Ninth Circuit has ruled that the use of force may be necessary "if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required." Spain v. Procunier, 600 F.2d 189, 195 (9th Cir. 1979). Further, "[w]hether in the context of

---

in the excessive-force analysis. See id.

[5]Defendants explain that a PACE entry is a personnel record (Doc. 145 at 3).

[6]Because the record before the Court is sufficient to demonstrate material factual disputes precluding summary judgment, any adverse inference stemming from Defendants' failure to preserve the videotape and PACE entry need not be addressed at this time. If necessary, the parties may raise spoliation-of-evidence issues in pre-trial motions.

- 11 -

a prison-wide disturbance or an individual confrontation between an officer and prisoner, corrections officers often must act immediately and emphatically to defuse a potentially explosive situation," and they must make decisions in haste and under pressure. Jordan v. Gardner, 986 F.2d 1521, 1528 (9th Cir. 1993).

Although Defendants vehemently argue that Plaintiff disobeyed orders and threatened them (Doc. 125 at 7-8), they do not dispute that he received no disciplinary report or any type of sanction for his alleged behavior. Nor do Defendants dispute that a PACE entry regarding Smith's conduct was written by Morrow and that this PACE entry was not preserved (Doc. 145 at 3, 5). The inference from this evidence—which must be drawn in Plaintiff's favor—is that Smith's conduct, not Plaintiff's, was culpable.

Nonetheless, Plaintiff gave a tug on the lead chain and refused to release his grip from the trap when officers needed to close it. These actions—with the cell door closed—may not have posed a significant danger to other inmates or Defendants, but given this recalcitrance, some force may have been necessary to keep Plaintiff's hands to the food trap and some force was required to get him to release his grip on the trap. Therefore, this factor tips slightly in Smith's favor.

### 3. Relationship Between Need for Force and Force Used

Prison officials may use force only in proportion to the need in each situation. See Spain, 600 F.2d at 195 ("[t]he infliction of pain and the danger of serious harm may be necessary if there is a threat of an equal or greater harm to others, as is reflected in the doctrine of self defense . . . . Inherent in the doctrine of self defense is the concept of proportion"). Therefore, prison officials "must balance the need 'to maintain or restore discipline' through force against the risk of injury to inmates." Hudson, 503 U.S. at 6. But the infliction of pain during the use of force "does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." Whitley, 475 U.S. at 319. Thus, as argued by Defendants, a simple overreaction by an officer is insufficient to establish an Eighth Amendment violation (Doc. 125 at 9).

Defendants contend that there is no evidence that Smith used force maliciously and sadistically for the purpose of causing harm (id.). They assert that Smith used de minimis force to retain control of the lead chain, to keep Plaintiff from grabbing him through the trap, and to restrain Plaintiff's arms so that Luque could remove the handcuffs (id.).

Plaintiff asserts that Smith's actions were more than an overreaction. He submits that Smith lost control when he started beating on Plaintiff's hand and arm—actions documented in Morrow's Information Report, cited above (Doc. 142 at 7;Doc. 126, Ex. I, Attach. 1 (Doc. 126-2 at 42)). Plaintiff argues that Morrow would not have written this report or subsequently written up a PACE entry for Smith's behavior in response to a simple de minimis use of force (Doc. 142 at 8).

Plaintiff further argues that had Smith's actions simply been an overreaction, Plaintiff would not have suffered the extent of injury that he did, and he reasserts that he continues to take pain medication for his neck and other areas, has seen a hand surgeon, and may need surgery (Doc. 142 at 8).

Lastly, in response to Defendants' claim that there is no evidence Smith used excessive force, Plaintiff states that there would have been such evidence had Littleton followed ADC policy and preserved the videotape of the incident (id.).

Construing the facts in Plaintiff's favor, Smith did not need to use the amount of force he did when pulling the lead chain, which was so hard that Plaintiff screamed in pain, because Plaintiff's hands were already out the food trap (Doc. 143, PSOF ¶ 11; Doc. 142 at 2). Further, Smith did not need to use any force to keep Plaintiff from grabbing him though the trap because Plaintiff did not try to grab Smith, nor did Smith need to use any force to restrain Plaintiff's arms for removal of the cuffs because Plaintiff was already gripping the trap (see Doc. 125 at 9). Defendants do not address Smith's actions after the cuffs were removed when, according to Plaintiff, he was gripping the trap and Smith beat Plaintiff's hand and arm with a close fist until stopped by Morrow (see id.). As stated, this alleged conduct by Smith is part of the crux of Plaintiff's excessive-force claim.

Given the above facts and Defendants' failure to present any argument regarding the

relationship between the need for force after Plaintiff's cuffs were removed and the force Smith used, this third factor weighs in favor of Plaintiff.

### 4. Threat Perceived

The fourth Whitley factor considers "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them." 475 U.S. at 321. In weighing this factor, courts should be mindful that "in making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used." Id. at 320.

Defendants argue that the Court should rule as a matter of law that there was no excessive force because Plaintiff's disobedience, threats, and attempted assaults on Smith entitled Defendants to perceive Plaintiff as a threat (id. at 10). Defendants assert that Plaintiff's yanking of the lead chain and his attempts to grab Smith's stab vest constituted objective threats (id.). Defendants add that they were aware that Plaintiff was designated as a high-risk inmate due to previous assaults on staff (id.).

Plaintiff contends that he posed no threat to staff or other inmates, particularly given that he was locked in a cell by himself (Doc. 142 at 8-9). He states that he has been assaulted by staff many times, but never before has the offending officer been penalized, and the one time an assault is caught on tape, the tape disappears (id. at 9).

There is no sworn statement from Smith indicating whether he felt threatened or perceived any risk at the time Plaintiff alleges he used excessive force. The Court agrees, however, that Plaintiff's status as a high-risk inmate, standing alone, made it reasonable for Smith and the other officers to conclude that Plaintiff presented a risk of potential violence towards others. Also, Plaintiff gave a small tug on the lead chain prior to the cell door closing, which arguably would present a threat to safety. But after the cell door was closed, pursuant to Plaintiff's facts, he did not attempt to grab Smith's stab vest, and upon removal of the cuffs, Plaintiff remained holding on to the trap with his right hand (Doc. 142 at 2-3;

Doc. 143, PSOF ¶ 13). In addition, as discussed, Plaintiff received no disciplinary report for any alleged misconduct or disobedience. These facts lead to the inference that Plaintiff's behavior was not particularly disorderly or dangerous.

In short, the Court finds that while the balance on this factor is close, it was reasonable for Smith to perceive some threat posed by Plaintiff, at least when Plaintiff tugged on the lead chain. This factor tips marginally in Smith's favor.

### 5. Efforts to Temper Force

In analyzing the last factor, the Court must keep in mind that the Eighth Amendment does not prohibit uses of force that appear unreasonable in hindsight, as long as the officers were acting in good faith and for a legitimate end. See Whitley, 75 U.S. at 322.

Defendants argue that Plaintiff offers no alterative to the force used that would have produced compliance on his part, and that Plaintiff cannot explain why force was unnecessary (Doc. 125 at 11). Defendants assert that the fact that Plaintiff was not pepper sprayed demonstrates that they tempered their use of force (id.). They also argue that the lack of any injury beyond red marks on Plaintiff's hands supports that they did not use excessive force (id. at 11-12).

Plaintiff responds by arguing that Defendant officers could have prevented the escalating tensions that began when Smith was escorting Plaintiff from the shower, yet no one made any attempt to control the situation (Doc. 142 at 9). Plaintiff asserts that he was never a threat, and he notes that in Morrow's Information Report, she did not state that Plaintiff was trying to harm staff; rather, she reported that he was just holding the food trap (id.). Plaintiff suggests that if Smith had allowed Morrow to deploy her pepper spray, as she was prepared to do, Plaintiff would have no complaint, but instead, Smith beat Plaintiff and caused Plaintiff's injuries (id. at 9-11).

Defendants argue that there was no way to temper the force Smith used (see Doc. 125 at 11). Verbal orders given prior to any use of force would be one example of an effort to temper force, and Defendants assert that Smith gave Plaintiff verbal directives to place his hands on the trap (Doc. 126, DSOF ¶ 28). But Plaintiff disputes that he refused to comply

with verbal directives to place his hands on the trap (Doc. 143, PSOF ¶¶ 11-12). The parties also dispute whether using pepper spray would have been an escalation in force or an effort to temper force prior to hitting Plaintiff's hand and arm. Plaintiff's allegations and medical records document that he suffered and continues to suffer pain sufficient to warrant prescription pain medication and his injuries have required specialist care. Viewing the facts in Plaintiff's favor, these injuries appear more severe than the temporary effects he would have incurred from pepper spray. Consequently, this final factor tips in Plaintiff's favor.

### 6. Conclusion

Because excessive force cases often turn on credibility determinations, the excessive force inquiry often "requires a jury to sift through disputed factual contentions, and to draw inferences therefrom[.]" Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) (quoting Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002)). As a result, "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Id.* For an excessive force case to go to the jury, the evidence must support "a reliable inference of wantonness in the infliction of pain." Whitley, 475 U.S. at 322. Here, with three out of the five Whitley factors weighing in Plaintiff's favor, there is a material factual dispute whether Smith's conduct constituted "obduracy and wantonness." See id. at 319. Summary judgment as to the excessive-force claim against Smith will therefore be denied.

## VII. Failure-to-Intervene Claim Against Luque, Morrow, and Mueller

"[A] prison official can violate a prisoner's Eighth Amendment rights by failing to intervene" to prevent a violation by someone else. Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995). A defendant-officer may be held liable for failing to intervene when he had enough time to observe what was happening and to intervene and prevent or curtail the violation, but failed to do so. See Lanier v. City of Fresno, 2010 WL 5113799, at *6 (E.D. Cal. Dec. 8, 2010) (citations omitted).

Defendants do not present any argument addressing Luque, Morrow, and Mueller's alleged failure to intervene to prevent the alleged excessive force by Smith. The request for summary judgment for these three Defendants is based on the excessive force arguments

addressed above. The Court has determined that there exist genuine issues of material fact precluding summary judgment for Smith. Absent any specific argument that Luque, Morrow, or Mueller are not liable for failure to intervene, summary judgment in their behalf is not appropriate. See Greene v. Solano County Jail, 513 F.3d 982, 990 (9th Cir. 2008) (finding that movant did not meet initial summary judgment burden on § 1983 claim where no argument on this claim was raised in the motion).

**VIII. Qualified Immunity**

When deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show that the defendants' conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. Pearson v. Callahan, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

In the opening paragraph of their motion for summary judgment, Defendants assert that they are entitled to qualified immunity, but within their motion they present no argument regarding qualified immunity (see Doc. 125). To the extent that Defendants assert qualified immunity based on the first prong, the Court has already determined that disputed facts, viewed in Plaintiff's favor, create a triable issue of fact regarding whether Defendants violated Plaintiff's Eighth Amendment rights. As to the second prong, the law on excessive force under the Eighth Amendment was clearly established at the time Plaintiff's claim arose. See Whitley, 475 U.S. at 320-21 (use of force violates Eighth Amendment if applied maliciously and sadistically for purpose of causing harm); see also Covington v. Fairman, 123 Fed. App'x 738, 741 (9th Cir. 2004) ("[i]n September 1998 it was clearly established that inmates were protected from wanton beatings that exceeded correctional officers' good-faith efforts to address a violation of prison rules"). Accordingly, summary judgment based on qualified immunity will be denied.

**IT IS ORDERED:**

1. The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 125).

- 17 -

2. Defendants' Motion for Summary Judgment (Doc. 125) is **denied**.

3. The Court will seek volunteer counsel to represent Plaintiff at trial if Plaintiff would like counsel. Within 20 days of this order, Plaintiff shall file a short memorandum stating whether he would like the Court to solicit volunteer counsel to represent him at trial.

4. The Court will set a final pretrial conference after it receives Plaintiff's response on volunteer counsel.

DATED this 24th day of July, 2013.

_____
David G. Campbell
United States District Judge