1  Thomas C. Horne
   Attorney General
2

3  Michael J. Hrnicek
   Assistant Attorney General
4  State Bar of Arizona No. 0022900
   1275 W. Washington St.
5  Phoenix, Arizona 85007-2926
   Telephone: (602) 542-4951
6  Fax: (602) 542-7670
   E-mail:  Michael.Hrnicek@azag.gov
7

8  *Attorneys for Defendants*

9              **UNITED STATES DISTRICT COURT**

10                   **DISTRICT OF ARIZONA**

11  Ron Zachary Pettit,
                                        No. CV 11-02139-PHX-DGC (JFM)
12          Plaintiff,
                                        **RESPONSE TO PLAINTIFF'S**
13  v.                                  **RENEWED MOTION FOR**
                                        **SPOLIATION**
14  Charles L. Ryan, *et al.*,

15          Defendants.

16          Defendants,[1] through undersigned counsel, hereby file their Response to Plaintiff

17  Ron Pettit's Renewed Motion for Spoliation ("Motion") (Doc. 220).   Defendants'

18  Response is supported by the following Memorandum of Points and Authorities.

19              **MEMORANDUM OF POINTS AND AUTHORITIES**

20          Notwithstanding repeat felonious-assault offender Pettit's conspiracy theory, the

21  primary reasons that the Court should deny his Motion is that no Defendant or institution

22  willfully disposed of evidence.   Following the maximum custody high risk escort in

23  which all Defendants and investigators agree no use of force or assault occurred, COII

24  Mueller and Sgt. Morrow forwarded the video to Lt. Littleton for review, Pettit

25  apologized to COII Smith, a critical mass of paperwork reviewing the escort was created,

26

27

28  _____
        [1]  Defendants are Luque, Morrow, Mueller, and Smith.

and Pettit was seen at medical with no evidence of abrasions or open wounds noted.[2] Neither Defendants nor ADC willfully destroyed or improperly failed to retain these items.  Although video of the escort, Sgt. Morrow's PACE of COII Smith, and a medical photo of a red mark on the top side of both wrists might be relevant to his claim of excessive force, it is improper to characterize the lack of retention of any of these items as spoliation.

Countless decisions are made in inherently dangerous and stressful prison environments daily and prison officials must be given due deference.  This is particularly true for Pettit, whose assaultive history and reputation of manipulating management and daily holding his trap open landed him not only in maximum custody, but with a high risk designation.  (Defendants' Statement of Facts in Support of their Motion for Summary Judgment, (SOF) Exhibit A, AIMS, (Doc. 126); Tr. Depo. Hope Ping at 58-59 (April 23, 2014) (Exhibit C).

In *Lewis v. Casey,* 518 U.S. 343 (1996), the Supreme Court indicated, "The District Court apparently misunderstood that a prison is neither a law firm nor a legal aid bureau.  Prisons are inherently dangerous institution, and decisions concerning safety, order, and discipline must be, and always have been, left to the sound discretion of prison administrators."  *Lewis*, 518 U.S. at 391.  Here, Lt. Littleton, Sgt. Navarrete, and Deputy Warden Curran conducted a prompt and reasonable inquiry, which included reviewing the video escort and directing Sgt. Morrow to write a PACE on COII Smith's professionalism.  Pettit then apologized to COII Smith and his medical records do not even reflect a *de minimis* injury—there was simply no reason to consider this a use-of-force situation.

---

[2] The objective part of his medical record from March 16, 2011 indicates "Red mark visible on top side of both wrists. Ø abrasions or open wounds noted.  I/M has full ROM [range of motion] of both hands, fingers, & wrist, skin warm & dry.  I/M does not show signs of acute discomfort."  (Doc. 142-4 Exhibit K at 2.)

Immediately following the escort, COII Mueller gave the video to Sgt. Morrow, and Sgt. Morrow gave it to Lt. Littleton.  Lt. Littleton testified that when he reviewed the video, nothing was visible at the food trap.  (Decl. Littleton ¶ 15; Tr. Depo. Raymond Littleton at 26 (May 7, 2014) (Exhibit D)). Lt. Littleton reviewed the video when Sgt. Morrow asserted COII Smith behaved unprofessionally.  (Tr. Depo. Littleton at 26-27 (Exhibit D).)  Because COII Smith's strike to Pettit's forearm did not constitute a Use of Force incident, triggering Use of Force reporting requirements, there was no reason to retain the video surveillance of Pettit's shower escort.  (Decl. Curran ¶ 41; Tr. Depo. Littleton at 30, 34-35, 42 (Exhibit D); Depo. Ping at 62 (Exhibit C).) Lt. Littleton reviewed the video, and "it showed nothing of any kind of assault, use of force, or anything at that point."  (Tr. Depo. Littleton at 53 (Exhibit D).)  He made a judgment call, and elected not to retain it, pursuant to ADC's retention policy, as it did not reflect a Use of Force or assault.   (*Id.*)

Pettit speculates "the video is the best, clearest evidence of what happened." (Motion at 14.)  Although there is no constitutional requirement that ADC videotape inmates or escorts of inmates, ADC does so to add an additional layer of accountability on the use of force continuum for inmates known to be particularly incorrigible and protect its officers;  the use of force continuum starts with presence of officers.  (Tr. Depo. Kevin Curran at 54. (Exhibit B).)

Lt. Littleton staged a re-enactment of restraining and unrestraining Pettit in a May 15, 2014 video using undersigned and non-party officers at SMUI.  (DVD filed under seal video #2 (May 13, 2014) (DVD #1).)  If it is reasonably similar to the missing escort video, it demonstrates Lt. Littleton's position regarding the lack of visibility of events at the food trap was accurate.  If true, the video would be irrelevant at best, to Pettit's case, and helpful to Defendants at worst for him.[3]   The most recent video of Pettit's

---

[3] If Pettit was so certain that Smith used excessive force throughout the escort, he did not raise that concern previously.  Only now, does he assert Smith was "wrenching the [lead] chain the entire escort, and yelling angrily . . ."  (Motion at 14.)  Where were these allegations in his Complaint or First Amended Complaint?  Where was this claimed in his

misbehavior on May 15, 2014, triggering activation of ICS and medical escort, reflects that videotaping Pettit's misbehavior could be a full time job. (DVD filed under seal June 19, 2014) (DVD #2).)

Because nobody, including Defendants, have information about what happened to the photo taken of Pettit's arm by medical or why Sgt. Morrow's PACE entry went missing after Lt. Littleton reviewed and submitted it to central office, Defendants should not be sanctioned for any inadvertence, mistake, or omission that caused this evidence not to be available. There is no evidence that any SSU or CIU investigation reports were destroyed. Defendants produced the SSU Memorandum to DWOP Curran to Pettit, which is attached to their Motion as Exhibit J. As to the result of DWOP Kevin Curran's CIU Request/Complaint, he believes his administrative assistant failed to forward the CIU Complaint/Request to CIU. (Decl. Curran ¶¶ 65-66; Motion at 7.)[4]

Joseph Nicoletti testified that an inordinate amount of space would be required to preserve the voluminous and sizable videos of inmate escorts conducted on a daily basis. Relying on information from Arizona State Prison Complex ("ASPC")-Eyman Deputy Warden of Operations ("DWOP") Kevin Curran, Nicoletti estimated that if even one five minute video of each High Risk inmate escort is retained on a daily basis, 7,280 videos per year would result, requiring 38 Terabytes (38 x 1,000 Gigabytes) of storage, costing $300,000 per each of the four ADC maximum custody units (SMUI, Browning, Central, and Lumley). (Decl. Nicoletti ¶¶ 8-11.) (Nicoletti's declaration erroneously indicated 38 Petabytes (38 x 1,000 Terabytes, due to a calculation error by undersigned counsel. (E-mail from Joseph Nicoletti (June 16, 2014), "Exhibit A.") Nicoletti's estimates were based on the video numbers and size estimates provided by Curran, and the sample videos provided by undersigned of being restrained and unrestrained in a cell at SMUI.

---

response to Defendants' motion for summary judgment (Doc. 125)?
[4] Although undersigned offered to make a member of CIU available for deposition to inquire further, Pettit's counsel declined the offer. Undersigned avers that his contact with CIU was unproductive, and no CIU investigative report was found.

4

The one minute video of undersigned was 175 Megabytes ("MB"), indicating that a five minute full escort video, using the same camera would be 875 MB.

At the time of his April 2014 declaration, Curran counted 18 inmates designated High Risk in SMUI and Browning Units alone, requiring video of all escorts.  (Decl. Curran ¶ 51.)  Additionally, there are more than 120 condemned row inmates which are designated as Enhanced Security, some of which require video escort.  (Decl. Curran ¶ 52.)  Finally, inmates that are designated for mental health watch require video escort, and can number 30 to 40 inmates at any one time just in SMUI and Browning.  (Decl. Curran ¶ 53.)   These inmates are daily escorted to various appointments, including recreational, showers, medical, dental, visitation, and religious, in addition to transfers. (Decl. Nicoletti ¶ 6.)

Curran estimates that escorts to recreation and showers are typically no less than five minutes, due to the fact that the inmate must be restrained with cuffs and a lead chain, extracted from the cell, brought to the showers, and unrestrained, prior to closing the shower door.  (Decl. Curran ¶ 54.)  When inmates disobey orders, refuse to kneel, argue with and threaten officers, or request special accommodations, the escorts can last much longer.  (Decl. Curran ¶ 55.)

The sample videos taken of undersigned at SMUI being restrained and unrestrained through the trap in a cell door confirm the video length can easily exceed five minutes, and memory storage requirements can be extreme.  Just the restraining and unrestraining of an inmate can easily take more than 60 seconds.  In terms of memory and storage, a 60 second video can be approximately 175 MB in size.  (DVD #1, video #2.)  The May 15, 2014 activation of ICS and medical escort reflect that videotaping Pettit's misbehavior requires a large amount of space.  (DVD #2.)   And the medical escort was unnecessary, given that Pettit admitted he had no injuries, but "just wanted to talk to somebody."  (*Id.*)  The first video on the DVD is 258,752 Kilobytes (258 MB), and the second video is 2,037,578 Kilobytes (more than 2 Gigabytes ("GB")).  (*Id.*)  If

Pettit actually had an injury, the video would presumably be significantly longer.

Accordingly, Nicoletti's $1.2M estimate for all four maximum custody units' video retention may be low. If Pettit alone has one 2 GB escort per week, 104 GB of storage would be required merely to store a year's worth of his videos. With approximately 180 high risk, mentally ill, and death row inmates being escorted daily, retaining 104 GB of storage annually for each would require 18,720 GB of storage, or 18.7 TB. If a single 2 GB escort is preserved per inmate on a daily basis for those same 180 inmates, the storage number increases by a factor of seven (7), to 130.9 TB.

Erring on the side of caution, Nicoletti considered a daily 30 minute video of 5.3 GB in size (Decl. Nicoletti ¶ 9) for 20 inmates, finding 7,280 videos per year would require 38.58 TB of storage. For 180 inmates, 347.22 TB of storage would be required. For two years of videos (representing the statute of limitations in Arizona), 784.44 TB of storage would be required. When considering that, apart from the maximum custody facilities, all of ADC's 57 prison units across all ten complexes must videotape uses of force, suicide watches, and other significant events, it is foreseeable that costs could balloon if capital investments are required at the remaining 54 non-maximum custody units. Because the capital investment at each max custody facility for need to plan for worst case scenarios, 784 TB would be required, and Nicoletti maintains his $1.2M estimate across the four maximum custody units, not including costs for installation, support services, power, cabling, or backup generators. (Nicoletti e-mail; Decl. Nicoletti ¶ 13 (Doc. 207).)   He explained, "We have quotes for a system that we [ADC] just put online, which was coincidental to this questioning of me by [undersigned]. Our standard that we use for virtualization and any increase in storage and based on numbers that we just obtained from our vendors that provide us the hardware. We use that . . . whenever we put any technology online . . . ." (Tr. Depo. Joseph Nicoletti at 24 (May 1, 2014).)

**II.    Spoliation: A Mechanism to Punish Culpable Parties & Institutions, Not State Governments Protected by Eleventh Amendment Sovereign Immunity. The State's Conduct Cannot Be Constitutionally Imputed to These Individual Defendants.**

According to Black's Law Dictionary, spoliation is "The intentional destruction, mutilation, alteration or concealment of evidence, usually a document." (Black's Law Dictionary (7th Ed.).) *Leon v. IDX Sys. Corp.* 464 F.3d 951, 958 (9th Cir. 2006) holds that "Dismissal is an available sanction when '*a party* has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings' because 'courts have inherent power to dismiss an action when *a party* has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.'" (emphasis added). In the March 26, 2014 hearing in this matter, the Court noted that "The traditional common law basis for an adverse inference instruction was intentional destruction of evidence by *a party*." (Tr. Hearing at 39 (emphasis added).) When considering a default sanction in response to spoliation of evidence, the Court must consider (1) the existence of certain extraordinary circumstances, (2) the presence of willfulness, bad faith, or fault by the offending *party*, (3) the efficacy of lesser sanctions, and (4) the relationship or nexus between the misconduct drawing the default sanction and the matters in controversy in the case. *Zest IP Holdings, LLC v. Implant Direct Mfg., LLC.,* 2013 WL 6159177 at *7 (S.D.Cal. 2013) (emphasis added). The *Zest* factors are discussed below.

The Court indicated that it seems clear that the Defendants had a duty to preserve the escort video, the PACE entry, and the medical photo. (Dkt. 193; Tr. March 26, 2014 Hearing at 7 (Exhibit G).) (1) Defendants do not believe there is a common law duty to preserve the missing evidence about which the Court is concerned as such a duty is impracticable and overwhelming at a maximum custody prison; (2) the Court should not and cannot impute non-parties' breach of any duty regarding evidence to Defendants; (3) any culpability lies at the feet of the non-parties; and (4) the missing video, PACE, and photo are no more relevant than the testimony of Pettit, Inmate Roy Earley, former Deputy Warden of Eyman Kevin Curran, Lt. Littleton, Defendants, and the Information Report, Supplemental Reports, Criminal Investigation Unit ("CIU") Complaint, Special

7

Security Unit ("SSU") Memorandum and Pettit's medical records that they replicate. Under both *Residential Funding Corp. v DeGeorge Financial Corp.*, 306 F.3d 99 (2nd Cir. 2002) and *Rimkus Consulting Group, Inc.*, *v. Cammarata,* 688 F.Supp.2d 598 (S.D. Texas 2010), Pettit's Motion fails. Spoliation does not apply to non-party states, over whom the Court has no jurisdiction, and that have not waived Eleventh Amendment immunity. Here there are no extraordinary circumstances, no evidence of willfulness, bad faith, or fault by Defendants, an adverse inference instruction would suffice (though Defendants challenge granting any sanction), and the relationship between the video, PACE, and medical photo are largely irrelevant.

### A.   This Court Lacks Jurisdiction Over the State, as it is Not a Party.

While Pettit argues, as he must, that "ADC is clearly the true defendant in this case" this statement is not grounded in fact or in law. (Motion at 10.) Neither Arizona, nor the Arizona Department of Corrections is a party to this matter. Pettit attempts to support this claim with a suggestion that undersigned unreasonably failed to clarify four witnesses' understanding that undersigned did not represent them at their depositions as their counsel. (*Id.*) He further claims that non-party State witnesses are only available to undersigned directly on the heels of depositions of these same witnesses he noticed. Finally, he violates Federal Rule of Evidence 408 and attaches settlement correspondence between the parties. On this basis, Pettit claims that the Court has jurisdiction over the State of Arizona. The defects in this argument are manifold, as discussed below.

### 1.   The State Has Not Consented to or Waived Jurisdiction.

First, and most important, the State has not consented to or waived jurisdiction. The State has not consented to or waived its Eleventh Amendment immunity here. As the Supreme Court indicated in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), there are constitutional limitations as to a federal court's jurisdiction over a state that did not consent to jurisdiction. In *Seminole Tribe*, the Supreme Court found that the Indian Gaming Regulatory Act's commerce clause did not grant Congress authority to abrogate

states' sovereign immunity.  517 U.S. at 48.

Pettit's lawsuit is not against the ADC and the State, as it would be barred by the Eleventh Amendment.  *Osborn v. Bank of the United States,* 22 U.S. 738 (1824).  It is, however, against individual § 1983 Defendants.  Even in such cases, however, state governments cannot be sued in federal court.  *Quern v. Jordan*, 440 U.S. 332 (1979).  The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  The Supreme Court has found that the Eleventh Amendment presupposes that each State is a sovereign entity in the federal system, and that "'[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.'" *Seminole Tribe*, 517 U.S. 44, quoting *Hans v. Louisiana*, 134 U.S. 1, 13 (1890), quoting The Federalist No. 81, p. 487 (C. Rossiter ed. 1961) (A. Hamilton); *In re Jackson*, 184 F.3d 1046, 1049 (9th Cir. 1999).  While federal courts have been deemed to have jurisdiction over states for purposes of injunctive relief, Pettit's 42 U.S.C. § 1983 suit is solely for money damages. *Will v. Michigan Dep't. of State Police*, 491 U.S. 58 (1989); Doc. 1.    Furthermore, although municipalities can be considered persons for purposes of § 1983, states cannot.  *Will v. Michigan Dep't. of State Police*, 491 U.S. 58; *Monell v. Dep't. of Soc. Svcs.*, 436 U.S. 658 (1978).

Overreach regarding a state's liability in § 1983 cases is fresh on the Ninth Circuit's mind.  In *Peralta v. T.C. Dillard*, 744 F.3d 1076 (9th Cir. 2014), the Court of Appeals *en banc* affirmed judgment as a matter of law to a corrections chief dental officer and chief medical officer at the close of an inmate's case who alleged a several month delay in getting his teeth cleaned and failing to treat pain amounted to a violation of his Eighth Amendment right.  *Id.* at 1089.  The defendants in that case claimed that delays in treatment were attributable to inadequate funding and resources from the state. *Id.* at 1082.

The Court held that "Damages are . . . entirely retrospective.  They provide redress for something officials could have done but did not.  What resources were available is highly relevant because they define the spectrum of choices that officials had at their disposal." *Peralta*, 744 F.3d at 1083.  The Court went on to specifically disagree with the dissent who "would have [had] the jury hold Brooks liable for delay in treatment caused by shortages beyond his control, on the theory that the state will wind up paying any damages award.  According to the dissenters, this will give the state an incentive to improve prison conditions." *Id.* at 1084 citing Christen Dissent 1092-93 and Hurwitz Dissent 1100-01.  But the state is protected from monetary damages by the Eleventh Amendment.  ***"We may not circumvent this protection by impute the state's wrongdoing to an employee who himself has committed no wrong."*** *Id.* at 1084 (emphasis added).  Similarly, punishing the individuals here for actions by ADC would circumvent the Eleventh Amendment as these individual Defendants had nothing to do with these evidentiary problems.

2.  <u>Undersigned Counsel's Conduct Does Not Create Jurisdiction or Waive Immunity.</u>

Pettit's arguments that Arizona Supreme Court Rule 42 and Ethical Rule 4.3 form the basis for federal jurisdiction over the State in this 42 U.S.C. § 1983 lawsuit are simply inaccurate.  (Motion at 10.)  *See Galen v. County of Los Angeles,* 477 F.3d 652, 662 (9th Cir. 2007) (§ 1983 does not provide a cause of action for violations of state law).  Here, as in *In re Jackson*, "The State of [Arizona] has not made a general waiver of its Eleventh Amendment sovereign immunity, and will only be deemed to have done so  . . . if it has unequivocally expressed its consent to federal jurisdiction." *In re Jackson*, 184 F.3d 1046, 1049, citing *Actmedia, Inc. v. Stroh*, 830 F.2d 957, 963 (9th Cir. 1986) (internal citation omitted).  If this Court lacks jurisdiction over the State of Arizona, how then can it impose sanctions against Defendants for the non-party State's employees' alleged mishandling of evidence?  Imposing a dispositive sanction against Defendants, absent evidence of their wrongdoing, would be tantamount to defaulting the State, thereby

violating the Eleventh Amendment.  *Peralta* precludes this result as "an end run around the Eleventh Amendment by subjecting the state to precisely the kind of economic pressure against which the amendment protects it." *Peralta*, 744 F.3d at 1084.  No matter how much e-mail (including communication protected by Federal Rule of Evidence 408) Pettit submits for the Court's review, there is no unequivocal expression of consent to federal jurisdiction here by undersigned or any other State representative.

3. <u>Spoliation by state agencies is not routinely imputed to § 1983 defendants; Pettit's authorities are irrelevant to states and are not binding</u>.

Notwithstanding Pettit's claim that "Courts regularly impute any spoliation by the real party in interest," only one of the three cases that Pettit cites for this proposition deals with a state entity, and does not discuss the Eleventh Amendment.[5]  (Motion at 8.) None of Pettit's cases is binding authority.  *Peschel v. City of Missoula*, 664 F. Supp. 2d 1137 (D. Mont. 2009) and *LaJocies v. City of North Las Vegas*, 2011 WL 1630331, *5 (D. Nev. 2011) deal with municipalities that were parties and are recognized as persons for purposes of § 1983.  Under that federal statute, cities and counties can be parties. *Monell*.  As much as Pettit may invite analogy to *Peschel* and *LaJocies,* in both cases there is no question that Missoula and the City of North Las Vegas were (a) cities (b) culpable parties and (c) not entitled to Eleventh Amendment immunity.  Neither case dealt with imputing the actions of non-parties to parties.    The cities were parties, and their actions were properly before the courts.  The *Peschel* Court  found "Undoubtedly, the [Defendant] City is at fault for the spoliation of the video recording."  664 F.Supp.2d 1137.  Similarly, the *LaJocies* Court specifically found "Defendants willfully failed to

---

[5]  The other spoliation cases Pettit references involve commercial, corporate and intellectual property litigation.  *See Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363 (9th Cir. 1992), *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), *Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006), *Radecki v. GlaxoSmithKline*, 375 F. Appx. 46 (2d Cir. 2010), *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583 (4th Cir. 2001), *LaFleur v. Teen Help*, 342 F.3d 1145, 1149-52 (10th Cir. 2003), *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939 (11th Cir. 2005).

11

preserve the [evidence]." LaJocies, 2011 WL 1630331, *5.  There is no analogy here.  Even if the Court elected to contemplate sanctioning Defendants for non-party Lt. Littleton's adherence to ADC's retention policy, this is not tantamount to fault, and certainly far short of willfully failing to preserve evidence.  He testified he saw nothing, and made a judgment call, though he directed Sgt. Morrow to write the PACE on COII Smith.

*Kounelis* is the closest case to Pettit's argument.  In that case, an inmate sued officers for violation of his rights under § 1983 and a recorded video purportedly portraying the assault was not transferred from a DVR hard drive to "a more permanent medium."  *Kounelis*, 529 F.Supp. 2d at 510.  Unfortunately, the district court's review of the parties' cross-appeals of the magistrate judge's order granting in part and denying in part spoliation sanctions did not address the Eleventh Amendment, nor explain any specific actions taken by any § 1983 defendant.  Accordingly, its value in interpreting the intersection of spoliation sanctions against Defendants and the State is limited.  To the extent that the *Kounelis* Court discussed the misdeeds of Cpt. Sagebiel and Lt. Cannon, they were defendants.

**III.   The Court Should Not Impose Civil Procedure Sanctions Against Defendants Absent Their Personal Culpability for Spoliation.**

**A.   No Court Order In Place**

Similar to *Zest's* "willfulness, bad faith, or fault by the offending party" standard mentioned above, the Federal Rules of Civil  Procedure authorizes sanctions for defiance of a court order.  The Court recognized that "Rule 37(c) talks about failure to provide information or identify a witness as required by the discovery rules."  (Tr. Hearing at 29.)  The Court went on to indicate, "it seems to [the Court] to be a stretch to say that that rule [Federal Rule of Civil Procedure Rule 37(c)] applies to [the State's] prelitigation loss of evidence."  (*Id*.)  Defendants contend that this is exactly correct.  This case, unlike *Chambers v. NASCO, Inc.,* 501 U.S. 32, 50 (1991), does not involve defiance of a direct court order, willfulness, bad faith, or even fault by any Defendant—the second *Zest*

determination (extraordinary circumstances is the first, and is discussed below).

The Court is interested in any common law duty that would apply in the instant circumstances, given that the evidence was not preserved at the pre-litigation level. Defendants do not deny that a common law duty could apply to the evidence in question. Although the Court invited briefing on the issue, Pettit offered no authority, noting simply "the spoliation occurred long before the Office of the Attorney General was involved." (Motion at 12 n. 6.)  Although Defendants do not dispute the Court's inherent ability to regulate prelitigation behavior, undersigned found no authority reflecting any common-law preservation duties correctional officers have in the Ninth Circuit.

The Court should instead consider *GRiD Systems Corp. v. John Fluke Mfg. Co., Inc.*, 41 F.3d 1318 (9th Cir. 1994), in which the Ninth Circuit held that a district court abused its discretion in awarding attorney fee sanctions for unreasonably or vexatiously multiplying a proceeding.  In that case, the Ninth Circuit held that, if sanctions were not appropriate under the authority claimed by defendants (28 U.S.C. § 1927), it should not have been imposed.  "We have previously held that 'the conduct in question must in fact be sanctionable *under the authority relied upon.*'"  *GRiD Systems Corp.*, 41 F.3d at 1320, quoting *Matter of Yagman*, 796 F.2d 1165, 1183 (9th Cir. 1986).  Regardless of Pettit's argument for "basic fairness," (Motion at 9), the Court lacks jurisdiction to issue spoliation sanctions against § 1983 Defendants based on alleged misconduct by non-parties in failing to preserve evidence under the authorities he has cited.

Absent support that any Defendant caused or contributed to evidence not being retained, the Court should not impose sanctions against them.  This is all the more so when the available evidence shows that COII Mueller and Sgt. Morrow delivered the video to Lt. Littleton, and Sgt. Morrow gave Lt. Littleton the PACE entry he instructed her to draft.  (Depo. Morrow at 42, 46 (Exhibit E).)

### B.    Rule 37(e) Applies, No Exceptional Circumstances.

Even if the Court was to entertain Rule 37 sanctions, the Court recognized Rule

37(e) may protect any alleged culpability by Defendants or Lt. Littleton's insofar as the video was not retained in accordance with ADC's retention policy.[6] It provides, "Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." Fed. R. Civ. P. 37(e). This is the situation before the Court.

Lt. Littleton testified in his deposition that he did not retain the video, pursuant to ADC's retention policy. (Tr. Depo. Littleton at 32-33 (Exhibit D).) Although he watched the video and saw Pettit behaving in a belligerent and threatening staff, staff taking him into his cell, removing his leg irons and shutting the door, it was not possible to see what was happening at the food trap. (*Id.* at 53-54.) Lt. Littleton did not witness COII Smith display any negative behavior during the escort on the video. (*Id.* at 56.) After Pettit requested a meeting with COII Smith to apologize for his behavior, Sgt. Ralph Navarrete (COII Smith's supervisor) advised Lt. Littleton everything was resolved. (*Id.* at 55.)

Lt. Littleton clarified that, even when inmates claim a use of force, the videos are not automatically retained, because "99.9 percent of the inmates don't ever say anything. It's after the fact." (*Id.* at 33-34.) If there is an incident during an escort that's recorded, the officer with the camera gives it to the shift commander to review, which was Lt. Littleton at the time of the subject escort. (*Id.* at 30.) If the shift commander observes an incident on the video, it goes to the Chief of Security. (*Id.*)

Although Lt. Littleton admits that it is possible COII Smith administered one or more strikes to compel Pettit to release his food trap after he was locked in his cell, the

---

[6] Pettit contends that sanctions might be appropriate for Defendants' failure to comply with Rule 26(b), but as the Court is aware, disclosure requirements did not previously apply in this matter when Pettit was an unrepresented prisoner, under Rule 26(a)(1)(B)(iv). It would be unjust, now that he is represented, to penalize Defendants for failing to comply with disclosure requirements that did not apply for the first two years of the lawsuit.

uncuffing process was not visible in the video.  (Decl. Littleton ¶ 16; Tr. Depo. Littleton at 53 (Exhibit D).)  Lt. Littleton testified that the video "show[ed] somebody going into the cell, taking the leg irons off, come back out, shut the door.  And at that point in time you can't see exactly what's going on at the food trap, and it showed nothing of any kind of assault, use of force, or anything at that point."  (Tr. Depo. Littleton at 53.)

Due to the amount of space and cost required to store large amounts of video recordings, ADC adheres to a retention policy, which requires video be preserved only when a Use of Force Report is generated, at which point the video is retained for one year.  (Decl. Kevin Curran ¶ 49.)  When Defendants and Lt. Littleton determined there had been no use of force event triggering a Use of Force Report for the escort, the video was not retained.  (Decl. Curran ¶¶ 59-60; Tr. Depo. Littleton at 33.)  When Lt. Littleton observed no use of force, it was within his discretion not to retain the video, a point about which DWOP Curran, and Deputy Warden Travis Scott agree.[7]  (Tr. Depo. Littleton at 33, 74 (Exhibit D); Decl. Curran ¶ 40-42; Tr. Depo. Curran at 34-35; Tr. Depo. Travis Scott at 31-33 (Exhibit F).)  Even had the video shown a closed-hand strike, it could have been considered self-defense, rather than a use of force.  (Tr. Depo. Ralph Navarrete at 38 (Exhibit G); Tr. Depo. Ping at 62 (Exhibit C).)

## C.   Notice: Pettit Wrote to the Grievance Coordinator, not Defendants or Lt. Littleton.

The Ninth Circuit has instructed that district courts may impose sanctions even against a spoliating party that merely had "simple notice of 'potential relevance to the litigation.'"  *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) [quoting *Akiona v. United States,* 938 F.2d 158, 161 (9th Cir. 1991)].  "Allegations of spoliation, including the destruction of evidence in pending or reasonably foreseeable litigation, are addressed

---

[7] While Pettit claims Deputy Warden Ping testified that the video should have been saved, she was never asked about Lt. Littleton's authority to review the video, find no assault or use of force, and elect not to retain the video.  Both Deputy Warden Scott and DWOP Curran were asked, and testified as indicated above.

in federal courts through the inherent power to regulate the litigation process if the conduct occurs before a case is filed or if, for another reason, there is no statute or rule that adequately addresses the conduct." *Rimkus* 688 F.Supp.2d at 598, citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43-46 (1991).  "If an applicable statute or rule can adequately sanction the conduct, that statute or rule should ordinarily be applied, with its attendant limits, rather than a more flexible or expansive 'inherent power.'" *Id.* "A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Id.* citing *Roadway Express Inc. v. Piper*, 447 U.S. 752, 767 (1980).  As discussed, there is no evidence of requisite bad faith here.

As much as Pettit would have the Court consider ADC as a monolith, where communicating to one employee imputes knowledge to others, this is simply not the case—particularly in a § 1983 case.  The Court should take note, as reflected in Pettit's Statement of Facts opposing Defendants' Motion for Summary Judgment, that his April 15, 2011 letter was not addressed to any of the Defendants, Sgt. Navarette, Lt. Littleton, Cpt. Ping, or ADW Scott.  It was addressed to COIII McClellan.  (Doc. 142-1, Attachment A at 1.)  Though Pettit asserts he discussed the matter with Sgt. Morrow, Sgt. Navarette and COII Smith, there is no indicating that he spoke with Lt. Littleton or that he asked COII McClellan to do so.  While COIII McClellan responded to Pettit on April 28, 2011, there was again no indication that he had discussed the matter with Lt. Littleton about preserving the video.  (Doc. 142-1, Attachment A at 2.)

Here, there was no Court order in place, and sanctions are not appropriate under the Federal Rules of Civil Procedure.  This is particularly true, given the absence of exceptional circumstances that would justify punishing Defendants for the Lieutenant's decision to adhere to ADC's retention policy and not retain the video.  Even if the Court contemplated imputing Lt. Littleton's actions to Defendants, how could it do so when there is no evidence of tampering or interference with the evidence by COII Smith, COII

Mueller, COII Luque or Sgt. Morrow?  Which would the Court sanction?[8]  Accordingly, no extraordinary circumstances exist, and the Court should resolve the first *Zest* determination in favor of Defendants.

**IV.     Sanctions Not Appropriate, Given Lack of Culpability, and Dubious Relevance of Duplicative Video, Photo and PACE.**

Defendants contend that "simply establishing a duty to preserve evidence or even the negligent destruction of evidence does not automatically entitle a litigant to an adverse inference instruction."  *Bracey v. Grondin*, 712 F.3d 1012 (7th Cir. 2013).  "While the Court has the discretion to impose sanction, 'the sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'"  *Zest IP Holdings, LLC v. Implant Direct Mfg., LLC*, 2013 WL 6159177, *5 quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).

In the instant case, no deterrence of the parties is possible, as it was not the parties themselves who failed to preserve the evidence Pettit seeks.  The Court should therefore

---

[8]    Courts may sanction parties responsible for spoliation of evidence in four ways: (1) Instruct the jury that it may draw an inference adverse to the party destroying the evidence; *In re Napster*, 462 F.Supp. 2d at 1060, 1066 (N.D.Cal. 2006) citing *Glover*, 6 F.3d at 1329, (2) Exclude witness testimony based on the destroyed evidence proffered by the party responsible for destroying the evidence; *In re Napster*, 462 F.2d at 1066 (citing *Glover*, 6 F.3d at 1329); (3) Dismiss the claim of the party responsible for destroying the evidence; *In re Napster*, 462 F.Supp. 2d at 1066, citing *Chambers v. Nasco*, 501 U.S. 32, 45 (1991)]; (4) Assess monetary sanctions for the costs of bringing the motion for sanctions for spoliation of evidence under Fed. R. Civ. P. 37.  *Zest IP Holdings, LLC*, 2013 WL at 6159177, *7.
    Courts should choose "the less onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim."  *Apple,* 888 F.Supp. 2d 976, 992, [citing *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3rd Cir. 1994] ("Apple I").  The choice of appropriate sanction must be determined on a case-by-case basis and should be commensurate to the spoliating party's motive or degree of fault in destroying the evidence.  *Apple v. Samsung,* 881 F.Supp.2d 1132, 1135 (N.D.Cal. 2012).

not consider this factor when fashioning a sanction.

If the Court considers placing the risk of an erroneous judgment on the parties who wrongfully created the risk, the evidence in this case has been that COII Mueller and Sgt. Morrow took appropriate measures to preserve the escort video and there is no reason to believe that COII Smith or COII Luque wrongfully created any risk of the evidence not being preserved.  COII Mueller gave the video recorder to Sgt. Morrow, and Sgt. Morrow gave it to Lt. Littleton.  (Tr. Depo. Morrow at 42 (Exhibit E); Decl. Littleton ¶ 15.)  Accordingly, deterrence should not be a factor in the Court's fashioning of a sanction.

**A. Evidence of Dubious Relevance.**

When considering how best to restore Pettit to the same position he would have been in absent the wrongful destruction of evidence, the Court should recognize that all witnesses are available for testimony and cross examination at trial, as is the critical mass of information reports, supplements, the CIU complaint, SSU Memorandum, and Pettit's medical records.  Additionally, the Court might allow the jury to view DVDs #1 and #2 in an attempt to reproduce some visual aid to assist their deliberation.  Finally, the Court could allow Pettit to perform a demonstration of his restraining and unrestraining in Court.  All of this reflects that a video would be duplicative of Pettit's and his witness's anticipated testimony.  While Pettit would claim it to be relevant, DVD #2 clearly shows another instance in which Pettit scuffles with officers after grabbing his food trap—the very behavior at issue in the instant matter.

Similarly, the PACE retreads familiar ground, as both Lt. Littleton and Sgt. Morrow have testified that it was written directly to address COII Smith's professionalism during the escort.  In addition to the deposition testimony already taken in this case, Pettit will have even greater opportunity to explore the content of the PACE at trial with these witnesses.

Finally, Pettit will argue that the medical photo is worth a thousand words.  The words in his medical records, however, suggest that a photo would have limited

relevance.  Redness on his forearms, with no abrasions is hardly compelling evidence to a jury reviewing an excessive use of force case.

**B.  Even Lesser Sanctions Fail Third *Zest* Determination.**

As to an appropriate sanction the Court might impose, Defendants submit that even a jury instruction regarding drawing inferences would be severe, given the lack of mental state surrounding the lack of preservation and the minimal prejudice suffered by Pettit.  Although the *Zest* factors are weighed in a spoliation context where default judgment is at issue, Defendants submit that this case fails the three-part *Zubulake v. UBS Warburg, LLC,* 220 F.R.D. 212, 216 (S.D.N.Y. 2003) test for determining whether to grant an adverse inference spoliation instruction.  *Zest*, 2013 WL 615177 (S.D.Cal. 2013) citing *Apple I*, 881 F.Supp. 2d 1138.  For these reasons, Defendants submit that the efficacy of lesser sanctions should be resolved in their favor under the third *Zest* determination.

**C.  No Nexus Between Missing Evidence and Defendants, and No *Zest* Nexus.**

It is difficult, if not impossible, to determine a sanction commensurate to Lt. Littleton's motive of not retaining the evidence because (1) he could not see any evidence of an assault or use of force event on the video and (2) ADC policy dictated he should not retain the video absent either.  This is the closest relationship that Pettit can argue connects any potential sanction and the matter in controversy in the case (as there is no evidence of any wrongdoing regarding the PACE or the medical photo—they are simply missing).  But Pettit has not challenged the constitutionality of ADC's retention policy, much less discussed how Lt. Littleton (much less Defendants) violated common law duties to retain the video, if in fact there was no assault or use of force event. Accordingly, the fourth *Zest* determination should be resolved in favor of Defendants.[9]

---

[9]     If the Court issues adverse inference instructions, Defendants submit the jury that may draw an inference (1) that the escort video might show some brief physical altercation between the parties,   (2) Sgt. Morrow's PACE of COII Smith was unflattering and challenged his professionalism, and/or 3 (3)  Finally, the Court may instruct the jury that it may infer that the missing photo of Pettit's arm would have shown he had redness

## V.    Policy Considerations.

While the Court indicates that it is interested only preserving videos that could lead to litigation, similar to a litigation hold, inmates—including Pettit—have demonstrated that they would like most, if not all videos of all escorts preserved.  If DW Ping is correct, and Pettit daily holds his trap, there is every reason to believe that a spoliation motion could be asserted every day that video is not preserved.  It is already apparent that Pettit claims excessive use of force by officers on May 15, 2014.  (DVD #2.)  It is equally apparent, however, that he did not claim any injury when he went to medical.  (*Id.*)  Must ADC preserve this video?  Certainly litigation is more than possible at this time—Pettit has claimed a violation of his civil rights.  In light of an inmate population with no entry barrier, no cost to them, many with protracted sentences to serve, there is nothing but upside to requesting any and all videos be retained and claims spoliation any time a video is not retained.  Pettit and the other inmates know how to overwhelm ADC staff and resources, and they are anything but reluctant to file lawsuits, meritorious and otherwise.

## VI.    Conclusion.

For the foregoing reasons, spoliation of evidence is not at issue, and the Court should deny Pettit's Motion.

RESPECTFULLY SUBMITTED this 24th day of June, 2014.

Thomas C. Horne
Attorney General


s/Michael J. Hrnicek

Michael J. Hrnicek
Assistant Attorney General
*Attorneys for Defendants*

on his arm, consistent with his medical records.

1
2
3
4
5
6
7

**CERTIFICATE OF SERVICE**

8

I hereby certify that on June 24, 2014, I electronically transmitted the attached

9

document to the Clerk of the Court using the ECF System.

10

This document and the Notice of Electronic Filing were automatically served on

11

the same date to the following, who is a registered participant of the CM/ECF System:

12

Daniel C. Barr, Esq.

13

Christopher S. Coleman, Esq.

14

Nicholaus A. Podsiadlik, Esq.
Perkins Coie LLP

15

2901 North Central Avenue, Suite 2000

16

P.O. Box 400
Phoenix, AZ 85001-0400

17

*Attorneys for Plaintiff*

18

s/Michael Hrnicek

19

Michael J. Hrnicek
#3848467

20
21
22
23
24
25
26
27
28