**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ron Zachary Pettit, | No. CV-11-02139-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Smith, et al., | |
| Defendants. | |

Plaintiff Ron Zachary Pettit filed a motion for spoliation sanctions in January 2014.  Doc. 163.  The Court held a hearing on March 26, 2014, at which it heard oral argument on Plaintiff's motion.  Doc. 195.  Based on the argument, the Court allowed Plaintiff to conduct additional discovery and file a renewed motion for sanctions.  *Id.* Plaintiff has now filed the renewed motion against Defendants Torrey Smith, Scott Mueller, Jose Luque, and Amy Morrow.  Doc. 219.  The motion is fully briefed and the Court heard oral argument on August 13, 2014.  For the reasons that follow, the Court will grant the motion in part and deny it in part.

## I.    Background.

Plaintiff is a prisoner at the Arizona State Prison Complex – Eyman, Special Management Unit I, in Florence, Arizona.  The Eyman facility is operated by the Arizona Department of Corrections ("ADC").  Defendants are correctional officers employed by ADC and assigned to Eyman.  Plaintiff alleges that on April 16, 2011, Defendant Smith violated Plaintiff's Eighth Amendment rights by using excessive force during an escort of

Plaintiff from the shower to his cell.  In his renewed motion for sanctions, Plaintiff asserts that several items of evidence relevant to his claim are now missing.

At the time of the alleged unlawful use of force, Plaintiff had been returned by Defendants from the shower and was standing inside his cell "facing away from the closed door." Doc. 163 at 5.  His arms were behind him and extended through the "food trap" in order to be uncuffed by Defendants.  *Id.*   Plaintiff claims that Smith "pulled on the chain hard, snatching [his] wrist through the food trap[.]" Doc. 142-1 at 2.  He states that after he pulled back on the chain, his "arm's (sic) were almost pulled out of socket," and that he had to turn "toward the door to relieve the amount of pressure on [his] shoulders and wrist." *Id.*  He claims that Smith pressed down on his wrist and held it against the trap, then hit Plaintiff's arm with his closed hand and "administered strikes." Doc. 163 at 5.  The sergeant in charge of the transfer, Defendant Morrow, allegedly intervened and told Smith to stop. *Id.*

Defendants allege that Plaintiff is "notorious for assaulting staff, disobeying orders, starting fires, and was designated 'high risk.'" Doc. 167 at 2.  They argue that Plaintiff attempted to grab Smith's "stab vest" and repeatedly yanked his lead chain, and that Smith's conduct was necessary to "compel [Plaintiff] to be properly uncuffed." *Id.* at 5-6.  Defendants do not dispute that Smith used "some modicum of force, up to and including pressing down on and/or striking [Plaintiff]'s hand/wrist/arm[.]" *Id.* at 6.

Defendants also do not dispute the following facts: (1) Defendant Mueller recorded the incident on a video camera and Sergeant Morrow immediately took the video recording to her supervisor, Lieutenant Littleton; (2) Morrow reported to Littleton that Smith had behaved unprofessionally, which caused Littleton to order her to write a personnel notation ("PACE report") for Smith; and (3) Plaintiff went to medical on April 20, 2011, where he was interviewed about the incident and his hand was photographed. Doc. 149 at 3-8.

At some point on the day of the alleged assault, Morrow, Mueller, and Sergeant Navarrete (Smith's supervisor) spoke to Plaintiff about the incident. Doc. 163 at 6.  The

accounts of this conversation vary, but it apparently caused Navarette to report to Littleton that the issue was resolved. Doc. 219-4 at 17 ("I had been notified by Sergeant Navarrette . . . . Everything was resolved. No issues."). Plaintiff was also visited by a nurse on the day of the incident. The nurse noted injuries to his hands and gave him ibuprofen. Doc. 163 at 6.

Later that night, Plaintiff wrote an inmate letter to "CO III McClellan" which stated several times that he had been assaulted by Smith, that he "was repeatedly grilled by Sgt. Navarrette to resolve the issue," and that he "started to feel threatened by [Navarette's] words, so [he] just gave in" to make it back to his cell safely. Doc. 142-1 at 2.

Plaintiff was taken to medical on April 20, 2011 – four days after the alleged assault – where an investigative report was completed by Sergeant Reyes and a photograph was taken of Plaintiff's hand. Doc. 149 at 8. Reyes's report notes that on the date of the incident Navarette asked Plaintiff multiple times if he was going to "pursue" the incident and Plaintiff said he would not pursue anything as long as he was taken back to his cell. *See* Doc. 219-2 at 2.

At issue in this motion are several pieces of evidence that are missing. The first is the escort video. Littleton testified to several facts in his deposition: (1) he reviewed the video, (2) it showed Plaintiff acting belligerently, (3) it did not show Smith doing anything wrong, and (4) the camera's view at the moment where Smith is accused of using excessive force was obscured by other Defendants who were standing between the camera and Plaintiff's cell door. Doc. 219 at 8. Littleton testified that he ordered the video to be erased three to five days after the incident. *Id.* at 9; Doc. 219-4 at 21, 26.

Morrow's PACE report about Smith's unprofessional conduct is also missing. Defendants previously asserted that the report was discarded by Littleton, but Littleton testified that he forwarded it to ADC's central office. Doc. 219 at 10. Navarette testified that two copies are usually made. Doc. 219-5 at 19. No explanation has been offered as to what happened to the PACE report or whether a second copy was made.

Plaintiff initially alleged that two investigative reports were missing: a report by the Criminal Investigation Unit ("CIU"), and an internal investigation report based on the April 20, 2011 interview of Plaintiff by Reyes ("SSU report").  Doc. 219 at 5.  Following discovery, there is some uncertainty as to whether this incident was ever actually referred to the CIU.  Plaintiff alleges that Deputy Warden Curran "asked the [CIU] to investigate the incident, which per ADC policy should have triggered the creation of a CIU report." *Id.* at 5.  But no CIU report exists, and Curran stated in a declaration that his signature on the CIU referral form was "scribbled out" and he does not know whether it was ever actually submitted to CIU for action.  *Id.* at 11.

As to the SSU report, during discovery Defendants produced a one-page SSU memorandum, written by Reyes, which had not been produced at the time of Plaintiff's initial spoliation motion.  Doc. 219-2 at 2.  At oral argument, Plaintiff's counsel argued that the final sentence of the memorandum, which states that "[a]ll information has been forwarded to administration for review and further action if needed," indicates that the report was accompanied by supporting documentation which has not been produced.  It is unclear whether any such documentation exists, but defense counsel stated that if it does, it may be available for production.

The April 20, 2011 photograph of Plaintiff's hand is also missing.  No new information was uncovered in discovery regarding the location of the photo.  Defendants cannot explain its disappearance.  Plaintiff asserts that Captain Ping took the photo, but she testified that she does not recall taking the photograph and does not know what happened to it.  Doc. 219-6 at 10.

As a remedy for loss of the video, PACE report, photo, attachments to the SSU report, and possibly a CIU report, Plaintiff seeks case-dispositive sanctions.  He asks the Court to "designate as established for purposes of the case, that Defendants used excessive force and [Plaintiff] was injured as a result."  Doc. 219 at 21.  He further asks the Court to "exclude evidence by Defendants regarding the amount of force used, to instruct the jury that Defendants have destroyed evidence that, if admitted at trial, would

show that Defendants used excessive force against [Plaintiff] and that [Plaintiff] was injured as a result[.]" *Id.*  Essentially, Plaintiff asks the Court for a directed verdict.

## II.   Legal Standard.

"The failure to preserve electronic or other records, once the duty to do so has been triggered, raises the issue of spoliation of evidence and its consequences." *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 219 F.R.D. 93, 100 (D. Md. 2003). Spoliation is the destruction or material alteration of evidence, or the failure to otherwise preserve evidence, for another's use in litigation.  *See Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 799-800 (N.D. Tex. 2011).

"A party seeking sanctions for spoliation of evidence must prove the following elements: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery[.]"  *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009) (quoting *Thompson*, 219 F.R.D. at 101); *see Victor Stanley, Inc. v. Creative Pipe, Inc. ("Victor Stanley II")*, 269 F.R.D. 497, 520-21 (D. Md. 2010); *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1070-78 (N.D. Cal. 2006).

"There are two sources of authority under which a district court can sanction a party who has despoiled evidence: the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37 against a party who 'fails to obey an order to provide or permit discovery.'"  *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (quoting *Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1337-38 (9th Cir. 1985)).  A district court exercising its inherent power may consider a number of sanctions, including (1) exclusion of evidence, (2) admitting evidence of the circumstances of the destruction or spoliation, (3) instructing the jury that it may infer that the lost evidence would have been unfavorable to the party accused of destroying it, or (4) entering judgment against the

1    responsible party, either in the form of dismissal or default judgment.  *See Peschel v. City*

2    *of Missoula*, 664 F. Supp. 2d 1137, 1142 (D. Mont. 2009); *see also Leon*, 464 F.3d

3    at 958.

4           The Ninth Circuit has instructed that before a district court imposes the "harsh

5    sanction" of dismissal or a directed verdict, it "should consider the following factors:

6    '(1) the public's interest in the expeditious resolution of litigation; (2) the court's need to

7    manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public

8    policy favoring disposition of cases on their merits; and (5) the availability of less drastic

9    sanctions.'"  *Leon*, 464 F.3d at 958 (quoting *Anheuser-Busch v. Natural Beverage*

10   *Distrib.*, 69 F.3d 337, 348 (9th Cir. 1995)).[1]  A "finding of 'willfulness, fault, or bad

11   faith' is required for dismissal to be proper."  *Leon*, 464 F.3d at 958 (quoting *Anheuser-*

12   *Busch*, 69 F.3d at 348).

13   **III.   Analysis.**

14          **A.     Duty to Preserve.**

15          A duty to preserve information arises when a party knows or should know that the

16   information is relevant to pending or future litigation.  *See Surowiec v. Capital Title*

17   *Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011); *Ashton*, 772 F. Supp. 2d at 800;

18   *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612 (S.D. Tex. 2010).

19   The duty to preserve is triggered not only when litigation actually commences, "but also

20   extends to the period before litigation when a party should reasonably know that evidence

21   may be relevant to anticipated litigation."  *Surowiec*, 790 F. Supp. 2d at 1005 (citations

22   and quotation marks omitted).

23          **1.     Initial Considerations.**

24          Although the duty to preserve is well established, there is some debate in this case

25   as to who bore that duty.  The Eighth Circuit has observed that the duty to preserve

26

27          [1] These five factors, which have been developed and applied most often in cases of
     failure to prosecute or disobedience of court orders, are not all applicable in a spoliation

28   analysis.  The factors of expeditious resolution of cases and management of the court's
     docket, for example, often will not be implicated when spoliation issues arise.  The Court
     nonetheless will apply the analysis consistent with the direction in *Leon*.

evidence generally applies only to parties: "Absent some special relationship or duty arising by reason of an agreement, contract, statute, or other special circumstance, the general rule is that there is no duty to preserve possible evidence for another party to aid that other party in some future legal action against a third party." *Wilson v. Beloit Corp.*, 921 F.2d 765, 767 (8th Cir. 1990) (internal citation omitted).

Defendants ask the Court to hold that no sanctions are appropriate in this case because they personally have no culpability for the loss or destruction of any evidence and ADC is not a party and therefore had no duty to preserve evidence. But ADC is not a disinterested third party. It is responsible for Defendants' training and conduct, and it had complete control over the relevant evidence in this case and over Plaintiff's ability to access that evidence and Defendants' ability to preserve it. Defendants individually had no ability to control the evidence; Morrow, for example, could not have walked into the office of her superior – Littleton – and taken custody of the video and the PACE report in order to preserve them for her defense. Nor could an inmate like Plaintiff exercise any control over evidence in ADC's possession.

What is more, the State of Arizona, of which ADC is an agency, indemnifies its employees for "any damages . . . for which the . . . employee becomes legally responsible if the acts or omissions resulting in liability were within the . . . employee's course and scope of employment." A.R.S. § 41-621(P). Arizona also funds the defense of its employees in civil cases arising out of the scope of their employment. *See* A.R.S. § 41-192.02(A). Thus, although suits directly against ADC and Arizona are barred by the Eleventh Amendment, suits brought against ADC employees have virtually the same effect – Arizona funds the defense and pays any judgment.

Because ADC controls the evidence and who has access to it, and the State is defending this case and will pay any judgment that results from it, the Court cannot conclude that ADC is merely a disinterested third party with no duty to preserve evidence. In all practical respects, ADC is in the same position as parties on whom courts routinely impose a duty to preserve – it is an agency of the State that funds the

1    defense and pays any judgment, its employees are subject to suit for their actions while in

2    its employ, and it has sole custody and control over most of the relevant evidence.  Given

3    these special circumstances, the Court finds that ADC had a duty to preserve evidence

4    relevant to this case once it knew that litigation was reasonably likely.  *See Wilson*, 921

5    F.2d at 767 ("special circumstance" can impose duty to preserve on a nonparty).

### 2.    Is There An Exception to the Duty?

7    Defendants "do not deny that a common law duty could apply to the evidence in

8    question" (Doc. 232 at 13), but argue that requiring ADC to retain videos of inmate

9    escorts would be unduly burdensome (*id.* at 4-6).  Defendants contend that "an inordinate

10   amount of space would be required to preserve the voluminous and sizeable videos of

11   inmate escorts conducted on a daily basis."  *Id.* at 4.  But nobody has suggested that ADC

12   must preserve every video of every escort.  The common law duty to preserve arises only

13   when a party reasonably anticipates litigation.  The vast majority of escorts at ADC

14   undoubtedly are unremarkable events that give no reason to anticipate litigation.  No duty

15   to preserve would apply to the recordings of such escorts.

16   But when an incident does occur on an escort that is sufficiently concerning for the

17   officer in charge to take the video to her commanding officer and write a PACE report

18   about the unprofessional conduct of her co-worker on the escort, and when the inmate

19   that very evening writes a grievance alleging excessive force on the escort, litigation over

20   the escort can reasonably be anticipated and a duty to preserve arises.  The video of such

21   a transport should be retained.  Defendants have provided no evidence regarding the cost

22   or burden that would be imposed by retaining videos in such unusual circumstances, and

23   the Court therefore has no reason to conclude that retaining them would be so

24   burdensome or disruptive to a state agency that an exception must be made to the

25   common law duty to preserve.[2]

26   _____

27   [2] The Court notes that Captain Hope Ping, an associate deputy warden with ADC,
     testified in this case that videos from the Browning facility are routinely saved to a
28   computer hard drive.  Doc. 219-6 at 15.  ADC apparently has encountered no capacity or
     cost problems in retaining these videos.

## 3. Additional Issues Regarding the Duty in this Case.

Having concluded that ADC is not exempt from the common law duty to preserve, the Court must address additional factual issues regarding when exactly the duty arose in this case. Defendants argue that the letter written by Plaintiff on the evening of the escort was sent to "COIII McClellan" and not to any of the Defendants, Littleton, or Navarette. Doc. 232 at 16. They contend that McClellan did not respond to Plaintiff until April 28, 2011, and that there is "no indication that he had discussed the matter with Lt. Littleton about preserving the video." *Id.* These facts, combined with Littleton's assertion that Navarette told him the issue with Plaintiff had been resolved, raise a question about whether Defendants reasonably could have anticipated litigation before the video was deleted a few days after the event in question.

As discussed above, the duty to preserve applies to ADC. The relevant question, then, is not when Defendants or Littleton could reasonably anticipate litigation, but when ADC could reasonably anticipate litigation.

The Court is mindful that "the duty to preserve evidence should not be analyzed in absolute terms . . . because the duty cannot be defined with precision." *Victor Stanley II*, 269 F.R.D. at 522. The Court must look at "reasonableness under the circumstances." *Id.* "Whether preservation or discovery conduct is acceptable in a case depends on what is *reasonable*, and that in turn depends on whether what was done – or not done – was *proportional* to that case and consistent with clearly established applicable standards." *Rimkus*, 688 F. Supp. 2d at 613 (emphasis in original).

Plaintiff submitted his grievance letter to McClellan on the night of the incident, alleging that he had been assaulted by Smith. *See* Doc. 142-1 at 2. At oral argument, defense counsel argued that no duty to preserve arose at that time. Counsel argued instead that the duty would not arise until after ADC had the opportunity to review Plaintiff's grievance and determine its merit. The Court has great difficulty with this suggestion. If a party has no duty to preserve evidence until after it has evaluated the merits of a potential claim, then presumably that party can with impunity destroy relevant

evidence while the evaluation is being conducted.  The party can, in effect, immunize itself from liability by destroying the very evidence needed to prove its liability, all because it has not yet completed its internal evaluation of the claim and a duty to preserve the evidence therefore has not arisen.  The Court cannot accept such a conclusion.

At the same time, the Court recognizes that some entities, particularly prisons, undoubtedly receive hundreds or thousands of complaints and grievances, some portion of which are plainly meritless and should not trigger a duty to preserve evidence.  How one balances this reality against the need to preserve evidence in clearly anticipated claims is not easy to determine in the abstract.  Such line-drawing is perhaps best left to the experience-based development of the common law.

The Court can conclude in this case, however, that a duty to preserve arose before the evidence was destroyed.  This was no routine transport or frivolous complaint. Morrow was sufficiently concerned about what occurred at Plaintiff's cell door to take the video to Littleton, tell him of Smith's unprofessional conduct, and then write a PACE report at Littleton's direction.  That evening, Plaintiff wrote a grievance letter to McClellan asserting that he had been subjected to excessive force by Smith.  The Court concludes that these facts were sufficient to put ADC on notice that litigation was likely and to trigger a duty to preserve relevant evidence.  The Court does not purport to adopt a broader rule.

**B.    Imputation.**

Defendants correctly note that none of them was responsible for the loss or destruction of evidence in this case – the evidence was lost while in the hands of others within the prison system.  Defendants would have the Court conclude that Plaintiff has no remedy because they are not personally responsible for the destruction of evidence.  The Court must therefore decide whether ADC's loss of evidence may be imputed to Defendants for purposes of resolving this case.

Plaintiff contends that courts "regularly impute any spoliation by the real party in interest – the state and its agencies – to the named officer in a § 1983 action," and cites

three district court cases where spoliation sanctions were granted against § 1983 defendants.  Doc. 219 at 12 (citing *Peschel*, 664 F. Supp. 2d 1137; *LaJocies v. City of N. Las Vegas*, No. 2:08-cv-00606-GMN-GWF, 2011 WL 1630331, at *5 (D. Nev. Apr. 28, 2011); and *Kounelis v. Sherrer*, 529 F. Supp. 2d 503 (D.N.J. 2008)).  These cases are not particularly helpful, however, because none of them directly addresses the standard for imputing spoliation.  Further, in each case the entity or individual accused of destroying evidence was named as a party.

Defendants argue that the Court cannot sanction them because they were not involved in the alleged spoliation, and that sanctioning them for conduct of other prison staff would violate the sovereign immunity granted Arizona by the Eleventh Amendment. Doc. 232 at 8.  Defendants contend that the Court has no jurisdiction over Arizona or ADC because neither is a party, and Arizona has neither consented to jurisdiction nor waived its sovereign immunity.  *Id.*  No party has suggested, however, that the Court exercise jurisdiction over Arizona or ADC.  The question is whether the Court should impose spoliation sanctions in this case for the loss of evidence by ADC.

Defendants argue that a recent Ninth Circuit decision, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014), shows that the Court cannot impute wrongdoing of other prison employees to Defendants who have no personal culpability.  Doc. 232 at 9. *Peralta* involved a claim of deliberate indifference to serious medical needs.  744 F.3d at 1081.  The plaintiff, Peralta, experienced delays in getting necessary dental work while incarcerated in a California prison, was injured as a result, and brought a § 1983 action against the prison's chief dental officer, chief medical officer, and a staff dentist.  *Id.*  The district court granted a directed verdict to the chief dental and medical officers and allowed the claim against the staff dentist to go to the jury, which ultimately found for the defense.  *Id.*  At issue on appeal was the district court's instruction to the jury that it could consider the lack of resources available to the dentist in deciding whether he had met his duty.  *Id.* at 1082.  Peralta argued such an instruction was improper and cited *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986), for the proposition that budgetary constraints

are not a justification for Eighth Amendment violations.  *Peralta*, 744 F.3d at 1083.  The Ninth Circuit reasoned that holding the defendant "liable for delay in treatment caused by shortages beyond his control, on the theory that the state will wind up paying any damages award" would violate Eleventh Amendment sovereign immunity.  *Id.* at 1084.  "We may not circumvent [the Eleventh Amendment] by imputing the state's wrongdoing to an employee who himself has committed no wrong."  *Id.*

*Peralta* does not control this case.  *Peralta* concluded that assessing a damages award against the defendant dentist which the State ultimately would pay through its indemnification duty, on the basis of the State's wrongdoing (failure to provide adequate medical resources for its prisons), would be tantamount to awarding damages against the State for its wrongful conduct, something the Eleventh Amendment forbids.  Such an award would constitute "an end run around the Eleventh Amendment by subjecting the state to precisely the kind of economic pressure against which the amendment protects."  *Id.*

This case is different.  Plaintiff seeks damages for violation of his constitutional right to be free from cruel and unusual punishment, not for spoliation of evidence.  He asks the Court to impute ADC's loss of evidence to Defendants in order to remedy the loss of evidence through appropriate trial sanctions.  He does not ask the Court, as did the plaintiff in *Peralta*, to impute to Defendants any wrongful actions by the State that contributed to or caused the constitutional violation.  Thus, this is not a case where the requested imputation would effectively establish the State's violation of Plaintiff's constitutional rights and subject it to an award of damages for that violation – a tactic which constituted the "end run around the Eleventh Amendment" in *Peralta*.

Plaintiff provides other valid distinctions.  He notes that the state action at issue in *Peralta* was a "policy or practice" of California, and that such policies and practices are protected from suit by the Eleventh Amendment.  Doc. 235 at 10.  He argues that the spoliation here is not a policy or practice of Arizona and accordingly "does not subject Arizona to 'the kind of economic pressure against which the [Eleventh Amendment]

protects.'"  *Id.* (quoting *Peralta*, 744 F.3d at 1084).  Plaintiff argues that if Littleton were a party to this action the Eleventh Amendment would not prevent the imposition of spoliation sanctions based on his destruction of evidence, and that the amendment accordingly should not "act as a bar to imputation here[.]"  Doc. 235 at 10 n.5.  Plaintiff further notes that *Peralta* discussed the availability of other remedies, specifically the availability of injunctive relief, and argues that in this case he has no other available remedy.  *Id.* (citing *Peralta*, 744 F.3d at 1083).  For these and the reasons discussed above, the Court concludes that *Peralta* does not bar the spoliation relief sought by Plaintiff.

The authority cited by the parties is largely unhelpful in determining whether spoliation may be imputed to Defendants.  Indeed, the Court has had difficulty finding any authority squarely considering whether spoliation of evidence may be imputed to a defendant who did not participate in the spoliation.  The court in *Victor Stanley II* noted that an act of spoliation by an agent is attributable to the principal.  269 F.R.D. at 515 n.23.  But there is no allegation here that any evidence was destroyed by an agent of Defendants.  In *Gurvey v. Fixzit Nat'l Install Servs., Inc.*, Civ. No. 06-1799(DRD), 2011 WL 550628, at *5 (D.N.J. Feb. 8, 2011), the court observed that "spoliation inferences are only appropriately entered against the party that actually destroyed the evidence," and that "it would serve no sensible purpose to punish innocent co-defendants so severely for the malfeasance of others."  *Gurvey* is distinguishable, however, because the court found that the plaintiffs had provided no evidence that any spoliation occurred.  *Id.*  Moreover, *Gurvey* did not involve the sort of relationship between the defendant and the spoliator that exists in this case.

The Sixth Circuit has affirmed a district court's denial of spoliation sanctions in a case that is factually similar to Plaintiff's.  In *Adkins v. Wolever*, 692 F.3d 499 (6th Cir. 2012), the plaintiff, a Michigan state prisoner, alleged that he was assaulted by a correctional officer, Wolever, who "yank[ed] his hands through a slot in the cell door before removing his handcuffs."  *Id.* at 501.  Surveillance footage of the incident was

lost, likely because it was stored on a computer that automatically deleted footage after ten days.  *Id.* at 502.  The district court concluded that Adkins was not entitled to spoliation sanctions because "the preservation of the evidence 'was entirely beyond Officer Wolever's control.'"  *Id.* at 504.  The Sixth Circuit affirmed, noting that it owed substantial deference to the professional judgment of prison administrators, and that a holding "that all defendants in situations like Wolever's must take affirmative steps to ensure that their employing prison continues to maintain evidentiary records for every incident with a prisoner would impose an added burden on prison employees."  *Id.* at 506.  The court also noted that "incidences raising spoliation questions" should be considered "on a case-by-case basis," and that the determination of whether sanctions are appropriate "rests within the broad discretion of the district courts."  *Id.*

Although the facts of the assault in this case are similar to those in *Adkins*, the facts surrounding the spoliation of evidence are not.  The video in this case was deleted by an ADC staff member who knew that a supervising officer viewed the incident as professional misconduct.  Further, the *Adkins* court did not address whether the prison itself had any duty to preserve evidence or to intervene in the operation of their computer system, and it is unclear whether arguments regarding those issues were presented. *Adkins* is therefore unhelpful in resolving the issue of imputation in this case.

For the same reasons that the Court found that ADC had a duty to preserve the evidence lost in this case, the Court finds that there is strong reason to impute the spoliation of ADC to Defendants to ensure that fairness is done at trial.  But the Court need not go that far to resolve this motion.  As will be explained below, the Court does not find that Plaintiff has made the showing required for case-dispositive sanctions.  The Court instead concludes that ADC's breach of duty and loss of evidence should be explained to the jury, that the jury should be allowed to infer that the lost evidence would have favored Plaintiff's position, and that Defendants should be precluded from presenting a substitute video they created to show why the lost video would not have contained meaningful information.  Although these steps will result in ADC's spoliation

having some negative consequences for Defendants at trial, it will not impute spoliation to them – no suggestion will be made to the jury that Defendants themselves are in any way responsible for the loss of evidence.

###### C.    Relevance and Prejudice.

Defendants argue that the spoliated evidence is of "dubious relevance," and assert that "the Court should recognize that all witnesses are available for testimony and cross-examination at trial, as is the critical mass of information reports, supplements, the CIU complaint, SSU Memorandum, and Petit's medical records."  Doc. 232 at 18.  Defendants further argue that the video would be duplicative of Plaintiff's testimony, and that the PACE reports would also be duplicative of other evidence.  *Id.*  The Court does not agree.

The video recorded the very events that Plaintiff claims constituted excessive force and that Morrow found sufficiently troubling to report to her superiors.  The Court and Plaintiff can take no comfort in Defendants' assertion that defense witnesses, who will favor the defense position, can testify about these events at trial.  Nor is it sufficient to say that Plaintiff, a convicted felon being held in high security, can testify against uniformed prison guards at trial.  The video camera was an objective witness that bore neither the potential pro-defense leanings of the defense witnesses nor the credibility problems of Plaintiff.  Without question, that objective evidence was highly relevant to the claims at issue in this case.  In addition, as other courts have explained in virtually the same circumstance: "Despite the limited viewing angle of the videotape . . . it is likely that it did still capture at least some of the altercation (whether sights or sounds) and could have potentially assisted the jury to understand the tenor of the event and to evaluate the credibility of the witnesses who are providing conflicting descriptions."  *LaJocies*, 2011 WL 1630331, at *2.  "The obvious inherent value of the video recording is that it would have allowed the jury, the arbiter of the facts, to see the actual events unfold and make its own collective assessment as to whether the force used . . . was or was not reasonable under the circumstances."  *Peschel*, 664 F. Supp. 2d at 1145.  "The jury would not be forced to rely on the conclusions drawn by the various witnesses as to

the reasonableness of the force used.  Rather the jury would have been able to form its own conclusions – unfiltered by the perceptions or sentiments of the various witnesses." *Id.*

The PACE report and the medical photograph were also plainly relevant.  They were contemporaneous records, recorded without the influences of a federal court lawsuit and the risks of trial.  They would have provided valuable information about the extent of Plaintiff's injuries and Morrow's fresh perception of Smith's conduct.  The fact that other evidence about the incident is available does not diminish the relevance of the missing evidence.  Plaintiff clearly has been prejudiced by the loss of important evidence.

### D.   Culpability.

Various Ninth Circuit cases have noted that sanctions may be imposed "not only for bad faith, but also for willfulness or fault by the offending party."  *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Co.*, 982 F.2d 363, 368 n.2 (9th Cir. 1992) (citing *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir. 1988)).  The Court is not persuaded, however, that this authority would support a dismissal of claims or a directed verdict without a finding of culpability approaching bad faith.

The concepts of willfulness and fault are imprecise.  Willfulness could include virtually any intentional act, such as adoption of an email management system that deletes stored emails after 30 days, even if the intentional action was not taken with an intent to destroy relevant information.  Fault is also broad, including mere negligence.  Ninth Circuit cases cited by the parties and found by the Court have not imposed case-terminating sanctions for negligence-level actions.

In *Leon*, the Court of Appeals affirmed a dismissal sanction.  *Leon* cited the "willfulness, fault, or bad faith" standard, 464 F.3d at 958, but affirmed the dismissal based on the litigant's "bad faith," a factual finding the Ninth Circuit found not clearly erroneous, *id.* at 959.  Specifically, the trial court and court of appeals both found that the plaintiff willfully deleted information and then ran a program to scrub his computer's memory, after he knew that the information was relevant in ongoing litigation with his

former employer.   *Id.* at 958-59 (noting that the plaintiff's "deletion and 'wiping' of 2,200 files, acts that were indisputably intentional, amounted to willful spoliation of relevant evidence").

In *Anheuser-Busch*, a case upon which *Leon* relied, the Ninth Circuit affirmed a dismissal sanction where the party had repeatedly and willfully lied that relevant documents were destroyed in a fire, when in fact she knew they had survived the fire. The case quoted the "willfulness, fault, or bad faith" standard, but the Ninth Circuit noted that the sanctioned party "had willfully and in bad faith violated the rules of discovery by withholding the documents from Anheuser and had repeatedly violated [the trial court's order]." *Anheuser-Busch*, 69 F.3d at 348.

In *Halaco Engineering*, the Ninth Circuit again cited the "willfulness, fault, or bad faith" standard, but reversed the district court's dismissal of an EPA counterclaim for misleading and incomplete litigation disclosures.   Although the Ninth Circuit did not dispute that the EPA had improperly failed to disclose portions of an investigative report and had used improper accusatory language in another public document, it held that "[t]he fault at issue was insufficient to support a dismissal."   843 F.2d at 380-81.   The Court noted that "[d]ismissal under a court's inherent powers is justified in *extreme circumstances*, in response to *abusive litigation practices*, and to insure the orderly administration of justice and the integrity of the court's orders."   *Id.* at 380 (emphasis added; citations omitted).

Finally, the Supreme Court's leading decision on a trial court's use of inherent power to impose sanctions, *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), speaks in terms of bad faith.   The Supreme Court held that a district court can assess attorney's fees as a sanction when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."   *Id.* at 45-46 (quotation marks and citations omitted); *see also Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 765-66 (1980) (attorneys' fees may be imposed as sanctions under court's inherent power for "bad faith").[3]

---

[3] In *Unigard*, the Ninth Circuit addressed *Chambers* and *Roadway Express* and

These cases persuade the Court that case-terminating sanctions require conduct akin to bad faith. As *Halaco* demonstrates, lesser forms of wrongful conduct are insufficient to support dismissal or a directed verdict. Thus, although the cases speak broadly of "willfulness, fault, or bad faith," the Court concludes that negligence or intentional-but-innocent conduct normally will not justify case-ending orders.[4]

There is no question in this case that the video was intentionally deleted at Littleton's direction. It is unclear exactly when the video was deleted, but Littleton testified that he met with Deputy Warden Curran approximately "three to five days after" the incident (Doc. 219-4 at 21) and had ordered that the video be deleted before he spoke with Curran (*id.* at 26). It is also unclear what Littleton knew about Plaintiff's allegations of assault at the time the video was deleted. McClellan received Plaintiffs' grievance in the evening after the incident occurred, but there is no evidence that Littleton was told about it. Further, Littleton testified that he was told by Navarette that the issue between Plaintiff and Smith had been resolved. *See id.* at 17.

---

observed that "[t]he bad-faith requirement . . . is very likely limited to the context of sanctions in the form of cost- and fee-shifting." 982 F.2d at 368 n. 2. The Ninth Circuit then went on to apply the "willfulness, fault, or bad faith" standard discussed above. *Id.* The Court cannot conclude from the *Unigard* footnote, however, that the high standard of bad faith would be required for an award of attorneys' fees, but not for the more severe sanctions of dismissal, directed verdict, or adverse inference instructions. As explained in the next footnote in this order, the Court views *Unigard* as an example of a unique line of product liability cases where loss of the allegedly defective product eliminates the defendant's ability to mount a meaningful defense.

[4] The Ninth Circuit faced a unique situation in *Unigard*, where the plaintiff insurance company sued the manufacturer of a space heater that allegedly had caused the insured boat to catch fire. Before the lawsuit was filed, but after its experts had examined the space heater and the boat, the plaintiff innocently destroyed the space heater and sold the boat for salvage, depriving the defendant of any opportunity to examine this key evidence. As a result, the district court precluded the plaintiff from presenting testimony from its experts and, because the plaintiff could not prove its claim without its experts, entered summary judgment for the defendant. The Ninth Circuit affirmed, noting that the plaintiff's actions "precluded Lakewood from any opportunity to inspect the evidence" and "rendered unreliable virtually all of the evidence that a finder of fact could potentially consider." 982 F.2d at 369. In the Court's view, *Unigard* falls within a unique line of cases where a party has destroyed the very item at issue in the lawsuit. Those cases generally dismiss the party's claim or defense because loss of the critical item effectively deprives the opponent of any meaningful opportunity to litigate the case. *See, e.g.*, *Silvestri v. General Motors Corp.*, 271 F.3d 583 (4th Cir. 2001); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939 (11th Cir. 2005). In this case, the lost evidence was important, but not the actual object of the litigation as in *Unigard*.

On the other hand, the evolution of Littleton's testimony about the video is concerning.  Defendants filed a declaration by Littleton on February 7, 2013 in response to Plaintiff's original motion for sanctions.  Doc. 130-1.  The declaration says nothing about Littleton watching the video or ordering its deletion.  In his subsequent deposition, Littleton testified that he remembered – about "a month and a half" before the deposition – that he had in fact watched the video.  *See* Doc. 219-4 at 34.  Littleton now recalls specific details of what the video showed.  While it is possible that Littleton had a sudden resurgence of memory, his testimony is at least suspicious.  The suspicion is compounded by the fact that the PACE report Littleton ordered Morrow to write about the incident is also missing, as is the photo of Plaintiff's hand.

This suspicion notwithstanding, Plaintiff has not shown that the video, PACE report, photo, and other possible documents were deliberately destroyed for the purpose of making them unavailable in this lawsuit.  And Defendants do provide at least some explanation for why they were not retained.

Considering the evidence as a whole, the Court cannot conclude that Defendants acted in bad faith.  The Court can conclude, however, that ADC breached a duty to preserve important evidence.  ADC clearly had reason to believe the evidence was relevant to likely litigation.  Morrow's reaction to the incident strongly suggested that something improper had occurred at Plaintiff's cell door.  The same day, a nurse visited Plaintiff and found injuries.  That night, Plaintiff wrote a letter of complaint to an ADC supervisor.  In light of these facts, the Court concludes that intentional deletion of the video and failure to preserve the PACE report and the photo of Plaintiff's injuries were at least grossly negligent.

### E.    Sanctions.

Although Rule 37 does not appear to be implicated in this case because there was no violation of a court order or other discovery rule, the Court concludes that sanctions are warranted under the Court's inherent powers.  The Court must "exercise caution in invoking its inherent power[.]"  *Chambers*, 501 U.S. at 50.  The Court is also mindful of

1   two of the five factors the Ninth Circuit has instructed the Court to consider: the public

2   policy favoring disposition of cases on their merits and the availability of less drastic

3   sanctions.  *Leon*, 464 F.3d at 958; *see also Halaco*, 843 F.2d at 381 ("The district court

4   must, before dismissing an action under its inherent powers, consider less drastic

5   sanctions.").

6        The Court is not convinced that Plaintiff's requested sanction – instructing the jury

7   that Defendants used excessive force which injured Plaintiff – is appropriate.  Such a

8   sanction would direct judgment in favor of Plaintiff.  Although the circumstances

9   surrounding the destruction of evidence are suspicious, Plaintiff has not presented clear

10  evidence of bad faith.  The Ninth Circuit's instruction to adopt a resolution that favors

11  disposition of this case on the merits, and that is the least onerous sanction needed to cure

12  the prejudice caused by ADC's loss of the evidence, persuade the Court that it should not

13  impose a case-dispositive sanction.[5]

14       Instead, the Court will allow the parties to present evidence and argument

15  concerning the lost evidence and will instruct the jury that ADC had a duty to preserve

16  evidence, ADC did not preserve the evidence, and the jurors may, but are not required to,

17  infer that the lost evidence would have been favorable to Plaintiff.  The Ninth Circuit has

18  authorized adverse inference instructions where the spoliator acted wrongly, which

19  requires notice that the destroyed evidence was relevant to likely litigation.  *See Akiona v.*

20  *United States*, 938 F.2d 158, 161 (9th Cir. 1991) (adverse inference instruction warranted

21  for destruction of documents "if it was wrong to do so, and that requires, at a minimum,

22  some notice that the documents are potentially relevant").  The Ninth Circuit has affirmed

23  the denial of such instructions where the actions of the alleged spoliator "did not evidence

24  bad faith, was not intentional, and reflected only inadvertence that at most was

25

26       [5] The Court would reach this conclusion even if case-terminating sanctions were
     available for conduct less severe than bad faith.  Decisions affirming case-ending
27   sanctions have involved more culpable conduct than has been shown here.  *See, e.g.*,
     *Leon*, 464 F.3d at 958; *Anheuser-Busch*, 69 F.3d at 348.  Thus, even if something less
28   than bad faith could support dispositive sanctions, the Court, as in *Halaco*, would find
     Defendants' conduct insufficient for such sanctions.  843 F.2d at 380-81.

negligence." *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 824 (9th Cir. 2002). ADC's actions in destroying the video recording were not inadvertent or merely negligent. As noted above, the Court finds that ADC was at least grossly negligent, that prejudice resulted, and that the circumstances surrounding the destruction are suspicious.[6]

The Court will also preclude Defendants from presenting the videos they created after-the-fact to suggest that the lost video would not have contained helpful information. Permitting the display of such videos when the actual video was not retained would, in the Court's view, be very unfair.

These sanctions will restore, as much as possible, the accuracy of the fact-finding process and relieve the disadvantage imposed on Plaintiff.[7]

---

[6] The Court does not mean by this holding to suggest that adverse inference instructions – which rightly are viewed as serious sanctions – should be too readily imposed. The Court notes that the Advisory Committee on the Federal Rules of Civil Procedure, of which the undersigned is the current chair, has proposed that adverse inference instructions be allowed for the loss of electronically stored information ("ESI") only when the party that lost the information acted with the intent to deprive another party of the information's use in the litigation. *See* www.uscourts.gov/uscourts/ RulesAndPolicies/rules/civil rules redline.pdf at 36-47. The reasons for this recommendation can be found in the Advisory Committee Note to the proposed amendment. *Id.* Although this case concerns deletion of a digital video file, it does not concern ESI in the sense addressed in the proposed amendment, which is concerned more with the operation of modern ESI systems and the ease with which information can be added to and lost by such systems.

[7] Defendants argue that the Court may not impose sanctions because current Rule 37(e) provides that "a court may not impose sanctions . . . on a party failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." Fed. R. Civ. P. 37(e). This rule, which refers to operations that occur "without the operator's specific direction or awareness," Fed. R. Civ. P. 37, advisory comm. note (2006), has no bearing here. The video was not "lost as a result of the routine, good-faith operation of an electronic information system" – it was deliberately deleted. Furthermore, even if ADC had an ESI system that deleted the video, once a party is aware of reasonably anticipated litigation it has a duty to intervene in the operation of such a system to prevent the loss of potentially relevant evidence. *Id.* ("When a party is under a duty to preserve information because of pending or reasonably anticipated litigation, intervention in the routine operation of an information system is one aspect of what is often called a 'litigation hold.'"). There has been no allegation that the other missing evidence was lost due to the operation of an electronic information system. All indications are that the PACE report and photographs were physical copies rather than electronic. Rule 37(e) therefore does not apply to them.

1      **IT IS ORDERED** that Plaintiff's renewed motion for sanctions (Doc. 219) is

2  **granted in part and denied in part** as set forth above.

3      Dated this 9th day of September, 2014.

4

5

6

7  _____

David G. Campbell
United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28